JESSIE O. JORDAN, Respondent, v. MISSOURI & KANSAS TELEPHONE COMPANY, Appellant.

Kansas City Court of Appeals, February 1, 1909.

1. MARRIAGE: Fraud: Voidable. A marriage entered into by reason of one party fraudulently concealing his diseased condition is not void but only voidable and the other party may condone the fraud and the marriage become indissolvable, though if she elect she may dissolve the marriage in the proper court.

2. ――――: ――――: ――――: Action: Interlocutory Decree: Second Marriage. One Ethel and M living in New York were married and thereafter Ethel brought an action to dissolve the marriage by reason of M's fraud, and obtained an interlocutory decree, and thereupon, with one Jordan, also living in New York, crossed into New Jersey and were married and returned to reside in New York, and thereafter obtained a final decree dissolving the marriage with M. *Held*, the interlocutory decree was not a dissolution of the marriage and the New Jersey marriage was absolutely void, since Ethel was then the wife of M, and Jordan on abandoning her and coming to St. Louis could enter into a legal marriage with plaintiff.

3. ――――: ――――: Dissolution: Relation. While as to matters of property the dissolution of voidable marriage may relate back to the beginning, such cannot be the effect in regard to the status of the parties to such marriage and until the final dissolution that situation prevents another marriage of either party.

4. ――――: Common Law: New York Law: Evidence: Appellate Practice. The fact that after the final decree dissolving the marriage with M, Ethel and J lived together several months as husband and wife, will not constitute a common law marriage since the New York law recognizes no such relation; and the evidence of that fact may be shown by the decisions of courts of that State, and the objection made to such evidence in tho record is insufficient to require a review in the appellate court.

5. **MASTER AND SERVANT: Electricity: Risk: Instructions.** Instructions relating to the master's duty in permitting an electric lighting wire to be attached to the poles carrying telephone wires among which his servant worked and was thereby injured, and also to the assumption of risk are reviewed and held so complete as to leave no room for complaint.

6. ————: ————: **Telephones: Lighting: Evidence.** Though the introduction of an electric lighting wire on the poles of a telephone company may render the business of the telephone servants much more dangerous, yet a servant knowing thereof must exercise care to avoid the same; but on the evidence in this case it cannot be said as a matter of law that the servant was guilty of contributory negligence.

Appeal from Buchanan Circuit Court.—*Hon. Chesley A. Mosman,* Judge.

AFFIRMED.

*T. F. Ryan* and *Gleed, Ware & Gleed* for appellant.

(1) The negligence pleaded was neither proved nor submitted to the jury, and there was therefore a fatal variance between the pleading and proof and plaintiff was permitted to recover upon negligence not pleaded. Raming v. Railway, 157 Mo. 447; Bohn v. Railway, 106 Mo. 429; O'Brien v. Steel Co., 100 Mo. 82; Current v. Railway, 86 Mo. 62. (2) Deceased assumed the risk and was guilty of contributory negligence. Roberts v. Tel. Co., 166 Mo. 370; Nicholds v. Glass Co., 126 Mo. 55; Epperson v. Postal Co., 155 Mo. 373; Peet v. Railway (Ia.), 55 N. W. 508; Smith v. Pierson (Minn.), 46 N. W. 49; Railway v. Hutchinson, 40 Kan. 51; Junior v. Power Co., 127 Mo. 79; Hollingsworth v. Biscuit Co., — Mo. App. —, 88 S. W. 1118; Meechan v. Railway, — Mo. App. —, 90 S. W. 102; Williams v. Railway, 119 Mo. 316; Thomas v. Railway, 109 Mo. 187; Lucy v. Hannibal Oil Co., 129 Mo. 40; Aldrich v. Furnace Co., 78 Mo. 559; Epperson v. Postal Tel. Co., 155 Mo. 373; Nicholds v. Glass Co., 126 Mo. 55; Bradley v. Railway, 138 Mo. 302; Glasscock v.

Walker, 16 Mo. App. 657; Harrington v. Railway, 104 Mo. App. 663.   (3)   The only instruction under which the jury could . return a verdict in this case told the jury that if it was Jordan's duty to go upon the pole in question, and if the wire was not insulated and therefore dangerous, and appellant knew or should have known of these facts, and Jordan was in the exercise of reasonable care, their verdict should be for plaintiff. This instruction was erroneous.   Schlereth v. Railway, 96 Mo. 509; Tabler v. Railway, 93 Mo. 79; Dale v. Railway, 63 Mo. 455; Moore v. Mill Co., 55 Mo. App. 491.   (4)   The record shows that plaintiff was not the widow of deceased, and therefore cannot maintain this action.   (5)   To prove the statutory law of New York governing the effect of the interlocutory decree, plain-' tiff offered in evidence the decision of a New York court · in the case of Pettit v. Pettit, 93 N. Y. Supp. 100.   The court simply announced that he would read this over, and it was not read to the jury.   It was not, therefore, in evidence, as foreign law must be proved like any other fact.   Hartman v. Railway, 39 Mo. App. 88; Robertson v. Stead, 135 Mo. 135, 36 S. W. 610; R. S. 1899, secs. 1228, 1229, 1232, 1279.   Moreover, that decision related to divorce suits, and not to suits to annul marriages for fraud.   (6)   The effect of the suit to annul the marriage and of the interlocutory decree therein must, therefore, be decided by the common law of Missouri.   Warren v. Luck, 16 Mo. 102; Houghtaling v. Ball, 19 Mo. 84; Meyer v. McCabe, 73 Mo. 236; Morrissey v. Ferry Co., 47 Mo. 521; White v. Chaney, 20 Mo. App. 389; Roll v. St. Louis Co., 52 Mo. App. 60; McPike v. McPike, 111 Mo. 216; Benne v. Schnecko, 100 Mo. 250; State v. Clay, 13 S. W. (Mo.) 837; Burdict v. Railway, 123 Mo. 221; State v. Cooper, 103 Mo. 266.   (7)   An action to annul a marriage differs from an action for a divorce.   A decree of nullity in the former action wipes out the marriage altogether, and after it the parties stand in all respects

as if they had never been married. Bishop, Marriage and Divorce (5 Ed.), secs. 118, 294, 690; Chase v. Chase, 55 Me. 21; Meredith v. Meredith, 79 Mo. App. 636; Eichhoff v. Eichhoff (Colo.), 36 Pac. 11. (8) Even if Jordan's first marriage be held to have been void originally, the record shows a common law marriage. Warren v. Luck, 16 Mo. 102; Houghtaling v. Ball, 19 Mo. 84; Busch v. Busch, 81 Mo. App. 562; Fenton v. Reed, 4 Johns. 52, 4 Am. Dec. 244; Blanchard v. Lambert, 43 Iowa 228; State v. Cooper, 103 Mo. 266; Dyer v. Brannock, 66 Mo. 391; Richard v. Breahm, 73 Pa. St. 140; Hays v. People, 25 N. Y. 390; Leister v. Moore, 96 U. S. 76. (9) The instruction of the court that if a ceremony of marriage was performed between plaintiff and deceased she was his wife, was erroneous in that it took from the jury all question as to the existence of the New York law, all question of a common law marriage, and every other question of fact. This was error. Dowling v. Allen & Co., 88 Mo. 293; Merritt v. Gibbon, 34 Mo. 98; Merriwether v. Cable Co., 45 Mo. 528.

*J. W. Mytton* and *Chas. C. Crow* for respondents.

(1) A void marriage is distinguished from a voidable marriage in that it cannot be ratified by cohabitation, agreement or actions of the parties, and requires no decree of annullment. Williams v. State, 45 Ala. 24; Patterson v. Hames, 47 U. S. 550; Drummond v. Irish, 52 Iowa 41; Dare v. Dare, 52 N. J. Eq. 195; 19 Ency. of Law, 1209, 1210. (2) A marriage which is merely voidable is valid for all civil purposes until its annullment has been pronounced by a proper tribunal. State v. Combe, 86 Wis. 498, cases there cited; Farley v. Farley, 94 Ala. 501; 1 Bishop on Marriage, Divorce and Separation, secs. 272, 1510; 19 Ency. Law, 1210, 1211; Griffith v. Smith, 1 Pa. Law J. 479; Smith v. Morehead, 59 N. C. 360; Tompert v. Tompert, 76 Ky. 326; 2 Revised Statutes N. Y., 1852, p. 321, secs. 3, 4;

1 Revised Statutes, Codes and General Laws of the State of N. Y. (3 Ed.), p. 1042; Wilson v. Jackson, 10 Mo. 336; Rae v. Hulbert, 17 Ill. 572; Bock v. Lauman, 24 Pa. St. 445; State v. Hinchman, 27 Pa. St. 479; Payne v. Insurance Co., 11 R. I. 411; Trowbridge v. Spinning, 23 Wash. 48, 68 Pac. 125, 54 L. R. A. 204. (3) Marriage as known to the common law is prohibited in the State of New York. Pettitt v. Pettitt, 93 N. Y. Supp. 1001. (4) In this case the deceased was a telephone lineman and his duties did not require him to know the dangers or condition of electric wires, and there was no evidence that he was familiar with the dangers or conditions of electric wires, and there is no evidence that he even knew that the wire that caused his death was exposed. The only danger that deceased was warned against or was expected to guard himself against was electricity in the telephone wires. Under these facts defendant is clearly liable. Barto v. Telephone Co., 126 Iowa 241, 101 N. W. 876; Curtis v. McNair, 173 Mo. 280. (5) Clearly the place where deceased was required to perform his duties with the uninsulated wire attached to the pole was unsafe, and the telephone company necessarily knew that deceased was ignorant of the danger, as it knew that it was no part of his duty to know such conditions and it is therefore clearly liable to plaintiff for furnishing her husband an unsafe place to work. It was certainly no part of deceased's duty to guard against a danger of which the telephone company knew him to be wholly ignorant. Browning v. Kasten, 107 Mo. App. 59; Chambers v. Chesters, 172 Mo. 464; Harriman v. Star Co., 81 Mo. App. 124; Devore v. Railway, 86 Mo. App. 429; Minnier v. Railway, 167 Mo. 99; Dean v. Waterworks, 106 Mo. App. 167.

ELLISON, J.—The plaintiff, claiming to be the widow of Conrad A. Jordan, brought this action for damages on account of his death, occurring while in de-

fendant's employment, and, as is charged, through defendant's negligence.   The judgment in the trial court was for the plaintiff.

Defendant denied that plaintiff was Jordan's widow, and placed its denial on the ground that at the time of the ceremony of marriage between them Jordan had a living wife from whom he had not been divorced, and, under the statute (section 4313, Revised Statutes 1899) such marriage was void.

The following facts developed at the trial: Jordan and Ethel Hannah lived in the State of New York. Ethel married Thomas Meskill, and thereafter discovering that he had concealed from her that he had a bad disease at the time of their marriage, she brought an action in the proper court in New York to annul the marriage on account of the fraud of Meskill in thus concealing his loathsome disease, which, it seems, may be done in that State.   An interlocutory decree was entered for her on the 1st of November, 1902, and a final decree was entered on the 27th of February, 1903.   After the interlocutory decree, but before the final decree, viz., some time in the month of November, Jordan and Ethel went into the State of New Jersey and were married, that is, they had a marriage ceremony performed and then immediately returned to New York.   They lived together for some months, until August, 1903. Jordan then came out to St. Louis, in this State, and on the following 16th of March, 1904, he and plaintiff were married in that city.

If the marriage between Jordan and Ethel Meskill was a valid marriage, then Jordan and this plaintiff's marriage was void, for the case shows that Ethel was then alive and no divorce had been obtained.   So the parties hereto join issue on the validity of the former marriage.   Plaintiff insists that it having taken place before the final decree in Ethel's favor annulling her marriage with Thomas Meskill, she had a living husband at the time and her marriage with Jordan was an

idle and unlawful ceremony and void; while defendant contends that the interlocutory decree was a sufficient annullment of the Meskill marriage to make the marriage of Ethel to Jordan valid, or, if not, the final decree afterwards pronounced related back to the date of the marriage and made it void from the beginning.

To concede that a void marriage (as, for instance, where one of the parties was already a married person), may be disregarded and another marriage had without annulling the void one, the concession would not aid the defendant in its contention that Jordan's marriage with Ethel was valid. For, her marriage to Meskill was not void; it was merely voidable; and there is a vast difference between the two words, or the two situations they describe. It is true that there are decided cases and instances where text-writers use the two words interchangeably. But when attention is called to the distinction between them and the difference in the consequences which results from the conditions they stand for, it is believed there can be but one opinion. [Tomppert v. Tomppert, 76 Ky. 326.] A voidable contract is good until avoided, and if never renounced or disowned, it remains valid. Thus, in the present instance, Ethel was deceived by the assurance that Meskill was free from disease. The law does not prohibit a woman from marrying a man who has a disease and, if she so wishes, she may contract such a marriage. But the law does prohibit her from marrying a married man, or her brother. The former act, if the disease was unknown, may be avoided on the ground of fraud; but if the defrauded party concludes that she will overlook the false representations there is no law to say that she shall not. The principle is the same as in any other contract, though there is a difference in the remedy by reason of the peculiarity of the marriage contract and its relation to the social order. In the ordinary contract the defrauded party may rescind and the two may voluntarily put themselves back

in their former position. But in the marriage contract, not absolutely void, while the defrauded party may have the right to rescind, so to speak, the rescission must come through the pronouncement of a competent court. The difference results from the disability of persons who have contracted a marriage from voluntarily abandoning it, as may be done with other contracts. So, if Ethel had concluded to overlook or condone Meskill's fraud, their marriage would have been binding and indissolvable.

But she had a right, if she so chose, to have it annulled by a competent court and she elected to do so. It is therefore too clear to be a proper subject of dispute that her situation and her rights were different from what they would have been had she married her brother, or a man with a wife. Her marriage to Meskill was a valid marriage until annulled.

When, then, was it annulled? Clearly not at the date of the interlocutory decree. The word itself indicates that it is not the end—that it is intermediate— that something may supervene affecting the status of the thing adjudged. In this case, suppose that after the interlocutory decree, Ethel had come into court and asked that it be set aside and the case dismissed; or that Thomas had come in and shown some reason why it should not have been entered; or that the court, when the final decree was asked, had, in a proper way, have become advised that the parties were in collusion, maybe by their own confession. In these instances there would never be a decree.

If these things could be, it demonstrates that an interlocutory decree is not the dissolution of the marriage. It shows there could not be a valid second marriage based on such decree, for there cannot be a valid marriage where either of the parties is in such situation that it may be rendered utterly void by the voluntary act of such party. Two persons cannot contract a valid marriage when either of them is possessed of the

privilege of annulling it by the assertion of a legal right. A valid marriage and a right reserved in either party to annul it, are wholly incompatible. They are legally impossible. A marriage, to be valid, must be absolute and not depend upon a contingency. Suppose that after a second marriage, the wife should say to her husband, "I am sorry I married you and I will go and dismiss my suit against my other husband, or I will refuse a final decree, and thus I will cease to be your wife and again become his." It would be hard to find more unreasonable or demoralizing condition of affairs; and yet that is the end to which defendant's position leads.

Reliance is placed on authorities cited by defendant which we think are without application. Thus in Eichoff's case, 101 Cal. 600 (36 Pac. Rep. 11), a second marriage was said to be valid which was entered into without an annullment of the first. But the first was absolutely void as having been entered into with an insane woman. That is, there was never a contract. That case assumed that the general law does not permit a marriage by insane people; and so the court said that a marriage had never in fact existed, and that the decree did not make it void, but merely declared that it had been void from the start. In the case at bar, as we have already seen, the marriage was valid until avoided by the decree.

But, aside from the foregoing suggestions, the decrees themselves show how much the interlocutory one lacked of being a disposition of the case. It reads (italics ours) that the plaintiff therein "shall be at *liberty* to have a final decree . . . *unless* this court shall otherwise order." And the final decree is rendered on a showing that the "defendant has made no motion or application with reference thereto."

A rule of law is invoked by defendant which we think does not apply to the question. It is that, though a marriage is only voidable, yet when avoided by a

decree, it relates back to the marriage itself and it is considered as void from the beginning, and that, in this respect there is practically no difference between a voidable and a void marriage; that therefore the marriage of the Meskills was as if it had not taken place. That might be true as to property and other rights depending on a valid marriage, as is shown in 2 Bishop on Marriage and Divorce, secs. 1596-1609. But such consideration is beside the real question here, for it cannot have the effect of changing a situation which prevents a valid marriage of one of the parties with another person, into a situation which permits a marriage. The question here is, in what situation was Ethel *as to her capacity to marry at the time of her ceremony with Jordan?*

Defendant finally insists that even though the marriage between Ethel Meskill and Jordan was void by reason of her not having obtained the decree of annullment at the time it was entered into, yet after she obtained her final decree, she and Jordan contracted a common law marriage in that State by living together as man and wife for several months. This point was rendered of no avail by the showing made by plaintiff that under the laws of New York there cannot be a common law marriage there. Failing to establish such a marriage in that State for the reason that it is not allowed there, it will not be considered a marriage in this State, though such marriages are valid here.

But defendant insists plaintiff did not show that common law marriages were not recognized in New York. To make such showing plaintiff introduced in evidence a decision of the Supreme Court of New York in the case of Pettit v. Pettit, 93 N. Y. Supp. 1001, brought to annul a marriage, where it was held that a common law marriage was not allowed and that a marriage to be valid in that State should be solemnized before a minister or officer, or else evidenced by a written contract signed and acknowledged by the parties. And

where it was further held that an interlocutory judgment is ineffectual to dissolve the marriage relation, and that a marriage entered into in a foreign State between a party to a divorce suit and a third person between the interlocutory and final decree, was absolutely void. And that while a voidable marriage might be ratified, a marriage which is a nullity because contracted while a prior existing marriage is in force is not the subject of ratification.

It is suggested that a report of judicial decisions in the authorized reports is not the proper way to prove a law of a foreign State. But no objection was made on that ground and we need not decide the point. The record shows that defendant stated that it was a question for the court and not the jury. Again the suggestion is made that the court merely remarked: "I will look at it" and did not admit the case in evidence. The record shows at another place that the plaintiff offered it in evidence "to which the defendant objected, which objection was overruled, to which action of the court the defendant then and there excepted." If this part of the record is taken, the objection stated no reason and was not therefore a proper objection. If we abide by another part of the record we find no reason stated that is now urged. We therefore regard the proof as made.

The deceased was engaged in defendant's service as a lineman. It appears that the defendant permitted an electric light company to string one of its wires on defendant's poles. This was sufficiently charged with electricity to be deadly to any one coming in contact with an exposed or uninsulated part. The charge in the petition is that thus allowing the electric light wire on defendant's poles rendered them an unsafe place to work and defendant knew it and that it was negligence in defendant to permit it. That the wire thus permitted to be upon defendant's poles was uninsulated at the pole where plaintiff was engaged at work, and

that defendant knew it.   The petition charges and the evidence shows that deceased was engaged at work on one of the poles in splicing telephone wires when he came in contact with the electric light wire and was instantly killed.

An extended argument has been made to show that defendant was not in fault and that deceased was; and that the instructions were bad.   We have however concluded that the case, on the whole, was properly submitted to the jury.

On the point of assumption of risk, the court properly instructed that such assumption did not include the defendant's negligence.   The court then gave a general instruction for the plaintiff which we regard as not subject to fair criticism.   It submitted to the jury whether defendant knew the wire was not insulated and was so heavily charged as to be deadly and to make the place an unsafe place in which to work; and whether the deceased came in contact therewith and was killed without negligence on his part.

The defendant secured a number of instructions which placed fully before the jury every permissible hypothesis of its non-liability.   Some of these were modified by the court, but the changes were quite properly made.   The whole of them left nothing unsubmitted which could properly aid the defendant.   They were so complete as to leave no room for complaint.

There is one important part of the case, as made for plaintiff, which defendant, more or less, ignores throughout the argument; and that is that the work in which deceased was engaged was of little danger and that it was made greatly more hazardous by the introduction by defendant of a highly more dangerous agency in close proximity, which was not a part of defendant's business, and the management of which was not in the hands of deceased or other of defendant's servants.   It is true that if, in such circumstances, the servant knows of the foreign dangerous agency, he must

exercise care to avoid it. But in this case we cannot say, as a matter of law, that deceased knew of the increased danger, or, that if he did, he was himself guilty of negligence directly contributing to his death.

An extended examination of the entire record leaves us without authority to interfere, and we hence affirm the judgment. All concur.