JOHN M. WILLIAMS, Claimant, *v.* THE STATE OF NEW YORK, Defendant.

Court of Claims, March 12, 1941.

*Lawrence Milberg,* for the claimant.

*John J. Bennett, Jr., Attorney-General [Martin P. O'Leary, Assistant Attorney-General,* of counsel], for the defendant.

GREENBERG, J. This is a motion, under subdivision 5 of section 10 of the Court of Claims Act, for permission to file a claim against the State after expiration of the time prescribed for the filing of the notice of intention or claim.

The claimant seeks by his proposed claim to recover the sum of $2,280 paid by him in weekly installments for the support of an incompetent maintained by the State, upon the ground that the payments were made under a mutual mistake of fact.

Before claimant may be relieved of his admitted default in filing, it is incumbent, among other things, that his proposed claim shall state a cause of action. (*Apropro* v. *State of New York*, 161 Misc. 142; affd., 252 App. Div. 803.) Consequently, it becomes necessary to determine whether that indispensable requirement has been met.

The fact set forth in the motion papers and the affidavits in support of the motion and in the affidavits and exhibits submitted in opposition thereto and undenied herein, are as follows:

About July 10, 1920, the claimant and one Antoinette Williams intermarried. Their civil marriage was followed by a religious ceremony on September 22, 1921. Thereafter they cohabited as man and wife and such cohabitation continued until October 24, 1935. On that day Antoinette Williams was committed as an incompetent person to a State hospital, where she is still confined. Pursuant to the Mental Hygiene Law the sum of fifteen dollars was fixed as the weekly amount to be paid to the State by the claimant for the incompetent's maintenance. The required payments were made weekly by him from about November 1, 1935, until about September 1, 1938.

In November, 1938, the claimant instituted an action in the Supreme Court, Kings County, to annul the marriage upon the ground that he had been induced to enter into it in reliance upon false representations made by Antoinette Williams in respect of her own mental condition as well as in respect of the mental condition of a number of her relatives. A final decree in favor of claimant, annulling the marriage, was entered on August 29, 1939.

The claimant asserts that, as his marriage has been declared to have been void *ab initio*, he never was the husband of the incompetent. With this as a premise, he further contends that, since he was not legally obligated to support the incompetent, his undertaking to do so was the result of a mutual mistake that entitles him to recover the moneys paid to the State for that purpose.

When the undertaking to pay for the incompetent's maintenance by the State was made by him, claimant had been married to the incompetent and had cohabited with her for a period of fourteen years. During that time he had held her out as his wife to the entire world. In making this bargain with the State for her maintenance, he likewise represented himself to be her husband. At that time he was her husband, alike in fact and in law. True, the marriage, as subsequent events demonstrated, was a voidable one. (Dom. Rel. Law, § 7, subd. 4; *Meserve* v. *Meserve*, 248 App. Div. 630.) But the fact is that during the period involved herein, and in which the incompetent was maintained by the State, no

election to avoid the marriage was exercised. Nevertheless, the claimant, now being armed with the decree annulling the marriage, seeks to invoke the doctrine of relation back in order to dissipate or circumvent these inescapable facts, and to recover the payments as moneys had and received that the State should refund on the theory of unjust enrichment.

It is settled law in this State that the entry of the decree of annulment had the effect of voiding the marriage from its very beginning. (*Matter of Moncrief*, 235 N. Y. 390, 397.) The doctrine of relation back involved in such a decree is not one demanding constant or universal application. However just its application may be between the parties to an annuled marriage, for the purpose of protecting the injured *pseudo* spouse, it does not follow that the doctrine is inevitably to be applied so as to impair the vested rights of third parties who did not participate in the fraud that resulted in the dissolution of the marital ties. (*Sleicher* v. *Sleicher*, 251 N. Y. 366.) In the latter case, CARDOZO, Ch. J., pointed out that " ' The doctrine of relation is a fiction of law adopted by the courts solely for the purpose of justice ' (*Gibson* v. *Chouteau*, 13 Wall. [U. S.] 92, 101; *Lynch* v. *DeBernal*, 9 id. 315, 325). It becomes an instrument of injustice when used to change the quality of the intervening acts or omissions by strangers to the controversy. The courts have shaped and restrained it in adoption to its purpose."

Is there, then, any injustice involved in the claimant's invocation of that doctrine against the State?

Essentially, the claimant is pressing a demand for moneys had and received from him by the State as the result of his mistake in believing that he was married to the incompetent.

The obligation to return moneys received under a mistake of fact is one imposed by law. Lord MANSFIELD early held, " If the defendant be under an *obligation*, from the ties of *natural justice*, to refund; the Law implies a *debt*, and gives this *action*, founded in the equity of the plaintiff's case, as it were upon a contract." (*Moses* v. *Macferlan*, 2 Burr. 1005, 1008.)

As it is the law that raises the fictional promise to make restitution for moneys received as the result of a mistake of fact, the law itself recognizes that circumstances may exist that warrant, or excuse, a refusal to make restitution. Thus, the fictional promise to pay will not be raised by the law in favor of a plaintiff who, though mistaken as to his legal right or duty, was under a moral obligation to confer the benefit received by the defendant, even though it may be one that could not have been recovered by action in a court of law. (*Moses* v. *Macferlan*, *supra*.)

Within this rule, the claimant has no cause of action for moneys had and received against the State.

As already stated, the claimant, after two marriage ceremonies, which was followed by fourteen years of cohabitation with the incompetent as man and wife, induced the State to maintain the incompetent on the representation that she was his wife and on his promise to pay therefor. It is not claimed that the moneys paid for that purpose exceeded the cost to the State of such maintenance. Indeed, the record indicates otherwise. Even assuming *arguendo* that, as the result of the subsequent decree of annulment, the claimant was under no legal obligation to support the incompetent, it can hardly be questioned that, pending the entry of that decree, he was under a moral, if not a legal, obligation to support her. And, whatever its legal rights against the claimant, the State, in maintaining the incompetent during that interim, was morally justified in receiving compensation therefor from the claimant in accordance with his undertaking. Hence, it is not inequitable for the State to retain these moneys, even if they were paid by claimant's mistake.

The question involved was ably answered in *Farmer* v. *Arundel* (2 W. Bl. 824) where the overseer of the parish of Grimley brought an action to recover moneys paid to the overseer of the parish of St. Martin's for the support of a pauper. Although the plaintiff had certified the pauper to the defendant, he claimed, in the action, that the defendant could not have enforced against the plaintiff a claim for the pauper's support. In denying a recovery, DaGrey, C. J., said (at p. 825): " When Money is paid by one Man to another on a Mistake either of Fact or of Law, or by Deceit, this action will certainly lie. But the Proposition is not universal, that whenever a Man pays Money, which he is not bound to pay, he may, by this Action recover it back. Money due in point of Honour or Conscience, though a Man is not compellable to pay it, yet, if paid shall not be recovered back. * * * The Parish of *Grimley* have acknowledged, the Pauper to be their Parishioner. And it is allowed, that he has been maintained four Years by the parish of *St. Martin's*. Admitting therefore that this Money could not have been demanded by the Defendant (which it is not now necessary to decide) yet I am of the Opinion that it is an honest Debt; and that the Plaintiff, having once paid it, shall not by this Action, which is considered as an equitable Action, recover it back again."

Moreover, it may be pointed out that the State, strictly speaking, has irrevocably changed its position as the result of claimant's conduct. When the incompetent was committed, the claimant,

it may be assumed, was not aware of the alleged fraud. In the absence of that knowledge, the marriage at that time was a valid, if voidable, one. The State was under no duty to maintain the incompetent, as she then had, in the person of the claimant, a self-confessed husband who, being financially responsible, was liable for that support. (Mental Hygiene Law, §§ 79, 80.) If payment had then been refused by the claimant, the State could successfully have enforced payment by action (Mental Hygiene Law, § 24-a) during the period involved, for the claimant's lack of knowledge of the incompetent's alleged fraud would, *ex hypothesi*, have prevented a successful contest of the State's action on his part.

The opportunity of establishing the marital status of claimant, during the period of payments, with its resultant liability, was a right of the State that it was induced not to exercise by the claimant's assertion of the existence of the marital relation and his payments. As the record shows, without dispute, that the incompetent herself now has no means and has no relatives from whom payment may be demanded by the State under the statute, it is clear that to permit the claimant to reverse the course of events initiated by him would clearly be detrimental to the State. Since his own acts induced a change of position upon the part of the State from which it cannot be relieved, the claimant, in good conscience, should be debarred from raising the issue now tendered as to all payments heretofore made by him to the State. As WERNER, J., said in *Ball* v. *Shepard* (202 N. Y. 247, 254), even in the case of a mistake between the parties to an action, " there can be no recovery if by reason of the payment the party receiving it has so changed his position to his prejudice that it would be unjust to require him to refund. (*Nat. Bank of Commerce* v. *Nat. Mechanics' Banking Assn.*, 55 N. Y. 211, 213, and *Hathaway* v. *County of Delaware*, 185 N. Y. 368, 370)."

Another insuperable obstacle to granting the motion is to be found in the claimant's failure reasonably to excuse his failure to file a notice of intention or claim within six months of the accrual of his alleged claim, as required by subdivision 4 of section 10 of the Court of Claims Act. This court may, in its discretion, permit a claim to be filed notwithstanding a default, but only " upon affidavits showing a reasonable excuse for the failure to file notice of intention." (Court of Claims Act, § 10, subd. 5.)

The cause of the default is laid at the door of the claimant's former attorney, who had represented him in the annulment action. Both the claimant and his former attorney must be charged with the knowledge that on August 29, 1939, when the marriage was

dissolved, the alleged claim against the State then accrued. No attempt was made to file a notice of intention or claim within six months thereafter. The present motion was made only on December 11, 1940, or more than a year after the accrual of the alleged claim.

The only excuse offered by the former attorney, in his affidavit, is that he " was under the mistaken impression that the time limitation within which to file the claim was two years from the date of the accrual of the claim, and that it was not necessary to file such notice of intention."

While such attorney states that he was consulted with reference to the claim, he does not state when this consultation took place. Nor does he say when, or whether, in fact, he was actually retained to prosecute the claim. None of the affidavits submitted by claimant indicate when the claimant's present attorney was retained, or when, or by whom, the default was discovered.

The provision requiring the filing of a notice of intention within six months after the accrual of a claim is not only in the present Court of Claims Act, but was, also, to be found in subdivision 4 of section 15 of the former Court of Claims Act. Both of these subdivisions are, in essence, the same. The filing requirement cannot be said to be characterized by novelty. If mere mistake or misapprehension, whether of a claimant or his attorney, as to the clear provisions of section 10 of the Court of Claims Act, is to excuse compliance therewith, the safeguards to the State therein provided for will be meaningless. In view of the decision in *Schroeder* v. *State* (252 App. Div. 16), it would exceed the limits of discretion to hold that the claimant has shown any reasonable excuse for his delay.

It, therefore, follows that the motion of the claimant for permission to file his proposed claim should be denied.