[S. F. No. 18989.   In Bank.   Dec. 29, 1955.]

MIMI STONE SEFTON, Appellant, v. SEIBERT L.
SEFTON, Respondent.

Franklyn M. O'Brien for Appellant.

Sefton & Gartland and Eugene L. Gartland for Respondent.

SHENK, J.—This action was brought by Mrs. Sefton to enforce the alimony provisions of a property settlement agreement.

The facts are not disputed. On December 6, 1951, Mrs.

Sefton was granted a final decree of divorce from the defendant. The decree confirmed and incorporated by reference a property settlement agreement which obligated the defendant to pay Mrs. Sefton $275 monthly for her support and maintenance. This obligation was to continue until the death or remarriage of Mrs. Sefton. The defendant made the regular monthly payments pursuant to the agreement through June 5, 1953.

On June 12, 1953, Mrs. Sefton entered into a ceremonial marriage with one Ross C. Marble. Thereafter she commenced an action to annul this marriage, alleging as the ground for annulment a species of fraud which would make the marriage voidable only. Marble appeared on the same day and consented that the annulment could be heard as a default matter. On June 19, 1953, Mrs. Sefton's marriage to Marble was decreed null and void.

Civil Code, section 139, as amended in 1951, provides: "Except as otherwise agreed by the parties in writing, the obligation of any party in any decree, judgment or order for the support and maintenance of the other party shall terminate upon the death of the obligor or upon the remarriage of the other party." The agreement here involved adopted language substantially the same as section 139 as amended and provided that the husband make payments for the support and maintenance of the wife ". . . until her death or remarriage. . . ." The sole issue is whether the annulment decree effectively revived the defendant's obligation to pay alimony, or whether Mrs. Sefton's voidable marriage to Marble was a "remarriage" within the meaning of that term as employed in section 139 as amended and in the property settlement agreement of the parties.

■ It has been said that an annulment decree has the effect of declaring a marriage void *ab initio*. ■ A divorce in this state merely dissolves the existing marriage, leaving intact the marriage relationship between the time of the marriage ceremony and the entry of the final decree. An annulment, on the other hand, has been said to "relate back" and erase the marriage and all its implications from the outset. (See *McDonald* v. *McDonald*, 6 Cal.2d 457 [58 P.2d 163, 104 A.L.R. 1290]. For particular application of this rule see *Niemann* v. *Deverich*, 98 Cal.App.2d 787 [221 P.2d 178]; *People* v. *Glab*, 13 Cal.App.2d 528 [57 P.2d 588]; *Withers* v. *Superior Court*, 91 Cal.App. 735 [267 P. 547]; *Sleicher* v. *Sleicher*, 251 N.Y. 366 [167 N.E. 501]; *Henneger* v. *Lomas*,

145 Ind. 287 [44 N.E. 462, 32 L.R.A. 848] ; *Clerke* v. *Menzies*, 2 L.R. Chan. Div. 298 [1922].) If the "relation back" theory is given strict application, as Mrs. Selton contends it should be, then her marriage to Marble never existed, she has not remarried as the property settlement agreement contemplates, and she would remain entitled to the alimony provided in the agreement.

Despite this contention, the doctrine of "relation back" is not without its exceptions. ▊ The doctrine was fashioned by our courts to do substantial justice as between the parties to a voidable marriage. It is a mere legal fiction which has an appeal when used as a device for achieving that purpose.

▊ The test for determining the applicability of the doctrine as applied to voidable marriages is whether it effects a result which conforms to the sanctions of sound policy and justice as between the immediate parties thereto, their property rights acquired during that marriage and the rights of their offspring. Certain rights of the purported spouses living under the color of a voidable marriage have been recognized as paramount to the doctrine in appropriate cases.

▊ It is well settled, for example, that a party who in good faith enters into a voidable or even an invalid marriage is entitled, upon annulment or other termination of the relationship, to have the property acquired during the purported marriage considered the same as community property and treated as such upon the dissolution of the marriage. (See *Shore* v. *Shore*, 43 Cal.2d 677 [277 P.2d 4] ; *Vallera* v. *Vallera*, 21 Cal.2d 681 [134 P.2d 761] ; *Sanguinetti* v. *Sanguinetti*, 9 Cal.2d 95 [69 P.2d 845, 111 A.L.R. 342].) ▊ The doctrine has similarly yielded to permit temporary alimony, court costs, attorney fees and appeal expenses. These may be ordered where appropriate in annulment actions. (Civ. Code, §§ 87, 137.3, 137.5; *Dunphy* v. *Dunphy*, 161 Cal. 87 [118 P. 445].)

However, in cases involving the rights of third parties, courts have been especially wary lest the logical appeal of the fiction should obscure fundamental problems and lead to unjust or ill-advised results respecting a third party's rights. Thus the exceptions to the theory of "relation back" should have their typical application to situations affecting an innocent third party. (See 55 C.J.S.2d, Marriage, § 68.) Logic has long ago yielded to principle in the solution of the problem of determining the status of the children of annulled marriages. ▊ While a strict application of the doctrine of

relation would reach back to deprive those children of their legitimate status, they are, of course, protected against the stain of illegitimacy not only where the marriage is voidable (Civ. Code, §§ 84, 85; *Estate of Wardell,* 57 Cal. 484), but also where the marriage is totally void. (Civ. Code, §§ 84, 85; *Rivieccio* v. *Bothan,* 27 Cal.2d 621 [165 P.2d 677].) The doctrine has been held similarly without application to other transactions involving the rights of third parties. (*Miller* v. *Wall,* 216 Ala. 448 [113 So. 501]; *Jordan* v. *Missouri & Kansas Tel. Co.,* 136 Mo.App. 192 [116 S.W. 432]; *Factor* v. *Factor,* 184 Misc. 861 [55 N.Y.S.2d 183]; *Williams* v. *State,* 175 Misc. 972 [25 N.Y.S.2d 968]; *Burney* v. *State,* 111 Tex. Cr. 599 [13 S.W.2d 375].) ■ A legislative caveat against the doctrine may be fairly inferred from Civil Code, section 86, which provides that: "A judgment of nullity of marriage rendered is conclusive only as against the parties to the action and those claiming under them." (See *Estate of Gosnell,* 63 Cal.App.2d 38 [146 P.2d 42]; *Price* v. *Price,* 24 Cal.App.2d 462 [75 P.2d 655].) ■ Therefore, whatever may be said for the fiction of "relation back" as a general principle in annulment cases, it must be deemed to apply only where it promotes the purposes for which it was intended.

■ It is apparent that Mrs. Sefton's contentions would not lead to those results. By the celebration of marriage she held herself out as having remarried. The defendant was entitled to rely upon her apparent marital status after the ceremony. If Mrs. Sefton's new marriage was subject to annulment for fraud as provided for in subdivision four of section 82 of the Civil Code, or for the incapacity of her new husband to enter upon the marriage state as provided for in subdivision six, or for any reason stated in subdivisions one, three and five of that section, the marriage would be voidable only. Redress by way of annulment might never be sought by the offended party and the marital status might thus continue indefinitely. The causes for annulment thus provided by statute are ordinarily known to or concern only the individual contracting parties. The divorced spouse, the defendant here, may never know of the circumstances which make his former wife's new marriage voidable. Certainly knowledge of such voidability may not be imputed to him. After the ceremony took place he could properly assume, in accordance with section 139 and the property settlement agreement, that his obligation to pay alimony had ceased. He was then entitled to recommit his assets previously chargeable to alimony to

other purposes. Under such circumstances it would be improper to reinstate his alimony obligation. ▪ While it is true that both the plaintiff and defendant may be deemed to be innocent parties, it accords with the policy of the law to look less favorably upon the more active of two innocent parties when by reason of such activity a loss is sustained as the result of the misconduct of a stranger. Here it is clear that Mrs. Sefton was the active party who brought herself and the defendant into their present situation. Accordingly, it is she who should assume the responsibility for it.

Counsel for Mrs. Sefton rely strongly on the case of *Sleicher* v. *Sleicher, supra* (1929), 251 N.Y. 366, which reached a contrary result, apparently on the theory that inasmuch as the laws of New York did not permit permanent alimony in annulment cases the divorced and remarried wife was entitled to some source of support and that notwithstanding her agreement wtih her divorced husband, he should be the one to reassume the burden. Following the decision in that case the New York Legislature enacted section 1140-a of the Civil Practice Act which provided that ''When an action is brought to annul a marriage or to declare the nullity of a void marriage, the court may give such directions for support of the wife by the husband as justice requires.'' Soon after the enactment of that law the same question as that involved in the Sleicher case came before the same court in 1954 in *Gaines* v. *Jacobsen*, 308 N.Y. 218 [124 N.E.2d 290]. In that case it was decided in effect that whatever the ''doctrinal basis'' for the holding in the Sleicher case, it faded away by the enactment of the new code section. The court then entered upon a discussion of the fundamental problem which obviously detracted from the soundness of the opinion in the Sleicher case and which lends support for the conclusion herein.

It is noted that in both of the New York cases a wife sought to reinstate alimony claimed not to have been terminated by a marriage later annulled. The wife was successful in the Sleicher case but unsuccessful in the Gaines case. The court considered the two situations in view of the new statute. However in the Gaines case the court recognized that the new statutory provision did not afford the wife in that case any advantage. In fact she did not invoke it because the husband of the annulled marriage could not have furnished her any support. And the court, while considering the statutory change, nevertheless departed from the application of ''relation back''

as employed in the Sleicher case when it considered it to be important that a divorced husband's obligations under the property settlement agreement were to furnish support until his former wife should remarry. The court held that ''there is nothing in the agreement which can serve as a basis for subsequently reviving those obligations''; that they would not ''be revived if the remarriage ended in divorce . . . and it is difficult to see any reason for a different result when it ends in annulment''; that it must have been the intent of the parties that upon the wife's remarriage the husband would be free of his duty for support and could assume new marital and economic obligations ''without remaining forever subject to the possibility that his first wife's remarriage would be annulled and the burden of supporting her shifted back to him''; that the ''wife, too, must have understood by remarrying she abandoned her right of support under the agreement, for better or for worse, in favor of whatever support would be furnished her by her second mate''; and that the plaintiff ''could not retain both husbands as sources of support; having made her choice, she is bound by it, although subsequent events prove it to have been improvident.'' It is obvious that the reasoning in the Gaines case has deprived the Sleicher case of any present persuasive authority. (See Cornell Law Quarterly, vol. 41, No. 1, pp. 141-147.)

The foregoing dictates the conclusion that the ceremony of remarriage in this case terminated the alimony obligation.

The judgment is affirmed.

Traynor, J., Schauer, J., and Spence, J., concurred.

EDMONDS, J.—Undoubtedly, in certain circumstances, a former husband obligated to support his ex-wife until her remarriage, will recommit his assets to other purposes when she enters into a ceremonial remarriage. In that situation, to apply mechanically the doctrine of relation back, upon the annulment of the remarriage, may impose considerable hardship upon the former husband by requiring him to resume the support of his former spouse. The opportunity of collusion between the wife and the husband of the remarriage should also be considered. On the other hand, a rule that in no case will the obligation to support be continued after a remarriage may cut off the former wife from all support without fault of her own.

These conflicting considerations of policy were discussed

in *Sleicher* v. *Sleicher,* 251 N.Y. 366 [167 N.E. 501] and *Gaines* v. *Jacobsen,* 308 N.Y. 218 [124 N.E.2d 290]. The ceremonial remarriage of Mrs. Sleicher was held to be a bar to her right to receive support from her former husband only during the existence of the remarriage. Commenting upon this decision, the court in the Gaines case said: "At the time of the Sleicher decision, it was impossible for a wife to obtain alimony or other support upon annulment of a marriage; it followed inexorably, from the theory that an annulled marriage never existed, that such a marriage created no subsequent duty of support. [Citation.] To have held otherwise than the court did in Sleicher would, therefore, have deprived the wife in that case of any source of support whatsoever." (124 N.E.2d 293.)

The situation of Mrs. Gaines was similar to that in Sleicher. It was held that the ceremonial remarriage terminated the former husband's obligation of support. Since the time of the Sleicher decision, the opinion states, "the legislature has enacted section 1140-a of the Civil Practice Act, which provides that

" 'When an action is brought to annul a marriage or to declare the nullity of a void marriage, the court may give such direction for support of the wife by the husband as justice requires.' "

The court then commented that "the new enactment, after the date of the Sleicher decision, alters the situation before us so materially that it calls for a different result in this case."

"Since the function of alimony payments is to provide support for a wife not otherwise supported, the reason for such payments fails when the wife requires a new source of support by remarrying. [Citation.] And by a ceremonial marriage she receives the right to support—even though the circumstances are such that grounds for annulment exist—for the entire period that the parties live together as husband and wife, unless and until there is an actual judicial declaration of annulment." (Citing Sleicher and other cases.)

The New York court discussed the arguments relating to the possible hardship upon the former husband upon his recommitment of his assets when the wife remarries, which discussion, my associates say, "obviously detracted from the soundness of the opinion in the Sleicher case and which lends support for the conclusion herein." In my opinion the Gaines decision should not be taken as a disapproval of the

rule earlier stated. Rather, the court pointed out that "[t]hese arguments were, of course, available to the husband at the time of the Sleicher case, but, as already noted, the fact situation was materially altered in the interim. In 1929, when Sleicher was decided, there was no section 1140-a, with the consequence that, if the remarriage ended in annulment rather than divorce, no alimony could have been awarded against the second spouse. If the court had determined that the wife had lost her rights under the agreement as well, she would have had no source of support whatsoever. To avoid this harsh result, the court had recourse to the doctrine that annulment relates back to destroy the marriage from the beginning. . . ."

As I read the Gaines opinion, the court departed from the rule of the Sleicher case for two reasons. The first one was the "practical justification" of the availability of the right to support from the second husband, the possibility of hardship to the former and the desire that the wife "be given neither two sources of support nor the ability to choose between her first and second husbands for the more profitable." The second reason was stated to be the "doctrinal basis." By the enactment of section 1140-a, "the legislature has chosen, without regard to whether the marriage is void or voidable, to attach to annulled marriages sufficient validity and significance to support an award of alimony, in other words, to serve, the same as any valid marriage would, as the foundation of a continuing duty to support the wife after the marriage is terminated." It was the Legislature's action in attaching to the remarriage, whether ending in divorce or annulment, the obligation of the husband to support the wife which was said to have "destroyed the very foundation of the Sleicher decision." It was for that reason, also, that the court felt justified in establishing the rule terminating the former husband's duty of support, for "[i]n the ordinary case, it is far more likely that justice will be served by not disturbing the first husband's discharge, and by leaving the wife to seek support, from her second husband, in the annulment action."

In California, there is no statutory basis for an award of permanent alimony in an annulment proceeding. Here the court is confronted with the situation presented in the Sleicher case, not that before the New York court at the time of the Gaines decision. It seems to me that the ends of justice might best be served by giving the trial judge an

area of discretion in determining whether the doctrine of relation back should be applied. In an action to have the alimony decree or support agreement enforced the husband could present evidence of reliance to his detriment upon the remarriage of the wife, and the wife be required to show both her need and the absence of collusion in the annulment proceeding. Such a rule would better serve the ends of justice and avoid possible hardship to one or the other of the parties than to give mechanical effect either to the decree of annulment or to the ceremonial remarriage.

In the present action, the husband urged as a defense a change of position in reliance upon the remarriage of the wife. In his memorandum opinion, the trial judge stated that the judgment was based upon the fact of the remarriage alone, and no finding was made on the issue tendered by the defense of a change of position. In these circumstances, the best disposition would be to reverse the judgment with directions to make a finding upon the issue of the husband's change of position, if any, the wife's need and the good faith in the annulment proceeding and determine the rights of the parties accordingly.