The parties were married on April 3, 1960, and the respondent obtained a divorce on the grounds of incompatibility on June 21, 1974. They entered into an agreement defining their marital rights and obligations on September 18, 1974. The pertinent provisions of that agreement are the following paragraphs:
 "3. The real estate owned by the parties jointly at . . . is to be continued to be held jointly by the parties. Wife is to live in the residence, rent free, with the children. If Wife remarries and remains in the residence, she will then purchase Husband's full one-half (1/2) interest to the property, based on the fair market value at that time as established by the appraisal of a qualified appraiser approved by both parties. If Wife moves from the premises at any time, then the residence is to be sold with the parties dividing the net proceeds equally. When the youngest child obtains the age of twenty-one (21) years of age, the residence is to be sold with Husband and Wife dividing the net proceeds of the sale equally, or Wife is to be given the option to buy out Husband's full one-half (1/2) interest in the property based on the fair market value at that time as established by the appraisal of a qualified appraiser approved by both parties.
 "4. Husband possesses the right to approve who resides in the residence, other than his Wife and children.
 . . . . .
 "13. Husband agrees to withdraw his appeal to the decision of the Family Court of July 3, 1974, and Husband will pay the mortgage on the residence aforesaid of TWO HUNDRED THIRTY-SEVEN DOLLARS AND FOURTY-FOUR CENTS ($237.44) and the sum of TWO HUNDRED EIGHT DOLLARS AND *Page 202 
THIRTY-THREE CENTS ($208.33) on the fifteenth and thirtieth day of each month for the support of his children."
On June 12, 1976, the respondent remarried. On June 30, 1976, the parties entered into what purports to be an agreement which amended paragraph 3 supra. Pursuant to this agreement, the respondent was permitted the right to sell the parties' home herself. She was given sixty (60) days to do so. Also, on the same day, allegedly, the parties agreed to reduce the petitioner's support payment to $138.89, which was to be paid on the fifteenth and thirtieth of each month, and the respondent was to pay one-half of the mortgage payment. She made this payment for the month of June.
The respondent testified that her new husband left the home on approximately July 5, 1976, and she obtained an annulment on September 23, 1976. The grounds for the annulment where physical impotency or incapacity for copulation in that the marriage was never consummated. 13 Del. C. § 1506(a)(2).
When her second husband departed, the respondent notified the petitioner that her second marriage was terminated and that the original agreement was reinstated. The petitioner has failed to make a mortgage payment since that date. The respondent has refused to sell the home. The petitioner filed this action requesting specific performance of the contract. This is resisted by the respondent, and she seeks a reinstatement of the original agreement.
The first issue presented to the Court is: If the respondent remarries and remains in the residence, do the provisions of paragraph 3 of the contract apply even though the marriage is subsequently annulled? There appears to be division of authority throughout the United States upon this and a similar issue. 45 A.L.R.3d 1033. The petitioner argues that the respondent's remarriage triggered her obligation to purchase the petitioner's one-half interest in the property regardless of whether she stayed married, was widowed, obtained a divorce or an annulment. Secondly, he argues that the June 30, 1976 agreement, which does not speak in terms of marriage is obviously not contingent upon her marital status and thus has been breached.
The respondent argues that the second marriage was a nullity and should be given no effect; thus, she has not breached the agreement. Furthermore, any agreement into which she entered because of her second marriage is also invalid.
The provisions of the Delaware Code which are pertinent to an annulment and this controversy are:
 13 Del. C. § 1506(a)(2):
 "A party lacked the physical capacity to consummate the marriage by sexual intercourse and the other party did not, at the time the marriage was solemnized, know of the incapacity;"
 13 Del. C. § 1506(b)(2):
 "For the reason set forth in subdivision (2) of subsection (a) of this section, by either party no later than 1 year after petitioner obtained knowledge of the described condition."
 13 Del. C. § 1506(c) and (d):
 "(c) Children born of an annulled marriage are legitimate. Marriages annulled under the section shall be so declared as of the date of the marriage.
 "(d) The provisions of this chapter relating to property rights of spouses are applicable to annulment."
The respondent maintains that her marriage was void abinitio and thus should not bring into operation the provision of paragraph 3 of the agreement concerning marriage. She citesWarner v. Warner, Del.Super., 177 A.2d 350 (1962) as authority for this premise. The holding of the Warner case is:
 "In connection with the marital status of the parties an annulment decree is a judicial declaration that the marriage never had a legal existence."
The issue before the Court in Warner was the status of a bigamous marriage. Also, the Court was careful to point out that the "relation-back theory" was a fiction which is sometimes ignored for the "purposes of justice." The case before the Court is not a *Page 203 
marriage which would be classified as void; rather, this issue before the Court is that of a voidable marriage.13 Del. C. § 1506(b)(2). Additionally, it should be noted that the distribution and acquisition of what is or what is not marital property applies to annulments. 13 Del. C. § 1506(d) and §1513(a). Thus, the Legislature recognized that while there may not be a "relationship," there are products of this "non-relationship" that require an accounting or distribution.
The respondent maintains that all "marriages" from which an annulment may be had are void ab initio. Under the Delaware statute, a person can obtain an annulment for impotency or incapacity for copulation at any point up to one year. If the Court adopts the argument as set forth by the respondent, it is giving an individual in a similar position the right of election for a period of one year. This is not equitable, and certainly no such provision is contained in the contract. The contract does not speak in terms of happiness or success; it speaks in plain terms of remarriage.
 "The word `Remarriage' is an ordinary one in common usage and the agreement contains nothing to indicate anything other than its use in its popular or conventional sense was intended. Certainly appellee must have understood that by remarrying she was abandoning her claim for support under the agreement, for better or worse, in favor of whatever support would be furnished by her new spouse. Appellee remarried and the alimony ceased. There is nothing in the agreement which can serve as any basis for its subsequent revival . . . ." Dodd v. Dodd, 210 Kan. 50, 499 P.2d 518
(1972).
In the instant case, the respondent paid one-half of the rent for the month of June; thus, she was well aware of the consequences of her actions.
The reasoning of the Court in Flaxman v. Flaxman, 57 N.J. 458, 273 A.2d 567 (1971) is most persuasive in this situation. That Court refused to reinstate alimony payments to a wife who had remarried and subsequently obtained an annulment. The Court reasoned that if the woman's husband had died penniless or the marriage had ended in divorce, she would not be entitled to have her alimony reinstated, and there was no difference between a voidable marriage which resulted in a divorce and one which terminated in death. The Court said:
 "Were we to hold otherwise, a husband, whose divorced wife had remarried, could never be certain that the financial responsibility for his former wife would not shift back to him. Moreover, only she and her second `husband' ordinarily would know whether there was cause for an annulment, and the option would be hers either to annul or ratify the marriage."
The "relation-back theory" has many exceptions. The purpose of this theory is to promote justice. Warner v. Warner, supra.
Apparently, the test which is applied when determining whether or not to apply this theory is whether it effects a result which conforms to the sanctions of sound public policy and justice between the immediate parties, the interrelation of property rights acquired during the "marriage," and the rights of any children. The rights of third parties not connected with themarriage should not be affected by an application of thistheory. Sefton v. Sefton, 45 Cal.2d 872, 291 P.2d 439 (1955). If, as in this case, both the petitioner and the respondent can be said to be innocent parties, sound public policy should dictate that the law look with less favor upon that party who was most active in bringing about the situation. In the present case, obviously the respondent was the person who was most active in bringing upon the litigants the present situation. Indeed, if she desired, she could have continued with her second marriage. Berdikas v. Berdikas, Del.Super., 178 A.2d 468 (1962). Thus, the provision of 13 Del. C. § 1506(c), which relates to a "relation-back" of an annulment, applies only to the immediate parties to that annulment.
A decision for the wife in the case before the Court would mean that a husband whose divorced wife has remarried could *Page 204 
not be certain of his financial obligations to that former spouse until more than one year after her remarriage. Public policy seems to dictate that the contract and the law (13 Del. C. § 1506(c)) should be interpreted as is the bigamy statute, which is contained in 11 Del. C. § 1001. The commentary on that section indicates clearly that going through a marriage ceremony is sufficient for conviction even though it is technically invalid. This result appears to be more in keeping with what was intended by the parties in the present case and by the Legislature.
The Court, having decided the first issue for the petitioner, finds it unnecessary to decide the other issues which were raised by the petitioner, and thus makes no finding. If the respondent desires reformation of the contract with reference to support for the children, she should make the appropriate application through the Court. See unreported opinion, J. L. C.v. E. C. D., Family Court, B-2407, Horgan, J. (5/13/77). *Page 709