FRANCES GAINES, Appellant, *v.* OWEN P. JACOBSEN, Respondent.

Argued November 29, 1954; decided December 31, 1954.

*Ira M. Millstein, Gabriel Kaslow, Edward C. Wallace* and *Jacob F. Raskin* for appellant.   I. The law of the State of Connecticut, in the absence of proof to the contrary, is the same as that of the State of New York.   (*International Text Book Co.* v. *Connelly,* 206 N. Y. 188; *Davis* v. *Davis,* 119 Conn. 194; *Thompson* v. *Thompson,* 14 Conn. S. 511.)   II. The decision of

this court in *Sleicher* v. *Sleicher* (251 N. Y. 366) is controlling and holds in effect that the words "until she shall remarry" used in a separation agreement require a valid remarriage for termination of husband's duty to make payments for wife's support and maintenance. (*Tafall* v. *Tafall,* 264 App. Div. 542.)

*Barent Ten Eyck* for respondent. I. The *Sleicher* case does not support plaintiff's position. II. New York law, apart from the *Sleicher* case, does not support plaintiff's position but affirmatively indicates that it is not well taken. (*Kirkbride* v. *Van Note,* 275 N. Y. 244; *Pomerance* v. *Pomerance,* 187 Misc. 20; *Williams* v. *State of New York,* 175 Misc. 972; *Dorn* v. *Dorn,* 282 App. Div. 597; *Coats* v. *Coats,* 160 Cal. 671.) III. Connecticut law does not support plaintiff's position. (*Erwin* v. *English,* 61 Conn. 502; *Town of Roxbury* v. *Town of Bridgewater,* 85 Conn. 196; *Sutton* v. *Leib,* 342 U. S. 402; *O'Brien* v. *O'Brien,* 3 Conn. S. 1; *Cary* v. *Cary,* 112 Conn. 256; *Stapleberg* v. *Stapleberg,* 77 Conn. 31.)

FULD, J. The question in this case is whether, under a separation agreement requiring annual payments for plaintiff's support "until she shall remarry", defendant husband's obligation to make the payments terminates permanently with the wife's "remarriage" or is revived by a later annulment of that "remarriage." The trial court, deciding that the agreement "contemplated a valid marriage", held that defendant's obligation was revived as of the date the second "marriage" was annulled. On appeal, the Appellate Division reversed, finding that plaintiff did remarry, within the meaning of the agreement, and that defendant's obligations were thereupon permanently extinguished, despite the later annulment.

Plaintiff and defendant, married in 1927, separated and entered into a separation agreement in March of 1944. The agreement provided, *inter alia,* that defendant was to pay to plaintiff $1,668 a year for her support and maintenance, during her life "or until she shall remarry"; it also required that defendant maintain a $10,000 insurance policy on his life for the benefit of plaintiff, "unless and until * * * [she] shall remarry." The agreement, it was specified, was to survive any decree of divorce and all questions relating to its "validity, interpretation and enforcement" were to "be construed and

determined in accordance with the law of the State of Connecticut.''

Two months later, plaintiff wife was granted an absolute divorce from defendant in Nevada, the decree providing, with respect to support and maintenance, that the parties be left to their agreement. Defendant husband remarried in August of 1944 and plaintiff married one George W. Harragan five years later. Upon her marriage to the latter, plaintiff advised defendant that she '' had been married '' and that he could '' quit making * * * the payments ''.

Harragan had obtained a divorce in Nevada from his former wife Rosalind prior to his marriage to plaintiff. Soon after that marriage, however, Rosalind instituted suit for divorce against Harragan in this state on grounds of adultery. The New York court, finding that there was no prior decree of divorce between them '' by any court having jurisdiction to grant the same,'' awarded Rosalind an absolute divorce. With this turn of events, plaintiff left Harragan and brought suit in this state for an annulment on the ground that he was married at the time of his alleged marriage to her. The action resulted in a judgment of annulment, '' declaring the alleged marriage * * * a nullity ''.

Plaintiff made no request for alimony in the annulment action, having been advised by her attorney that Harragan was so burdened with debts and alimony payments to Rosalind that the court would make no award against him.[1] Neither did she make any claim that defendant resume payments under the agreement until about a year and a half later, feeling, as she put it, that '' I got myself in trouble and I would take care of myself.'' In February of 1953, however, she commenced this present action against defendant (1) to recover support and maintenance payments allegedly in arrears under the separation agreement and (2) to require defendant to provide and maintain the $10,000 insurance policy for her benefit.

Although the agreement stipulates that Connecticut law should govern its construction and effect, the Appellate Division, concluding that the question posed had never arisen in the courts of that state, rested its determination on New York law. In so

1. We are advised of the fact — not in the record — that Harragan died in December, 1953, following the trial of the present action.

doing, it was correct. In the absence of proof to the contrary, we must assume that the law of Connecticut is the same as the law of New York (see *International Text Book Co.* v. *Connelly*, 206 N. Y. 188, 201), and, indeed, both parties, as well as the Appellate Division, agree that the major question in this case is whether our decision in *Sleicher* v. *Sleicher* (251 N. Y. 366) is controlling.

In the *Sleicher* case, a separation agreement, incorporated in a Nevada decree of divorce, provided for payments to the wife " so long as she remains unmarried "; the wife's subsequent remarriage was later annulled because of the second husband's insanity. The court held that the first husband's obligation to make the payments was not terminated by the invalid remarriage, resting the decision on the doctrine of " relation " back or " rescission from the beginning "— that is, as the court put it, that an " annulment when decreed, puts an end to [the marriage] from the beginning * * *. It is not dissolved as upon divorce. It is effaced as if it had never been " (251 N. Y., at p. 369). Accordingly, the husband was required to pay all installments due from the date of the annulment. The court, however, rejected the wife's claim that she was also entitled to the payments which fell due during the period of the second marriage and before its annulment. In that connection, it observed that the " ' doctrine of relation is a fiction of law adopted * * * solely for the purposes of justice ' " and that it is " not * * * without limits, prescribed by policy and justice ", which " have their typical application to the rights and duties of a stranger " (p. 369). Accordingly, since the " purpose of an award of alimony is support for a divorced wife not otherwise supported " (p. 371), and since the wife was supported by her second husband until their marriage was annulled, the court denied recovery from her first husband for the period during which the second marriage continued.

At the time of the *Sleicher* decision, it was impossible for a wife to obtain alimony or other support upon annulment of a marriage; it followed inexorably, from the theory that an annulled marriage never existed, that such a marriage created no subsequent duty of support. (See *Jones* v. *Brinsmade*, 183 N. Y. 258.) To have held otherwise than the court did in

*Sleicher* would, therefore, have deprived the wife in that case of any source of support whatsoever. However, since that time, the legislature has enacted section 1140-a of the Civil Practice Act, which provides that

" When an action is brought to annul a marriage or to declare the nullity of a void marriage, the court may give such direction for support of the wife by the husband as justice requires ".

This new provision, respondent urges, by removing the primary and underlying motivation for the *Sleicher* decision, distinguishes that case from the one before us and justifies us in reaching a different conclusion. Appellant, on the other hand, contends that there is no basis for distinguishing *Sleicher,* and that it is dispositive of this appeal.

While resolution of the dispute may not be easy, it is our opinion that the new enactment, after the date of the *Sleicher* decision, alters the situation before us so materially that it calls for a different result in this case.

Since the function of alimony payments is to provide support for a wife not otherwise supported, the reason for such payments fails when the wife acquires a new source of support by remarrying (cf. Civ. Prac. Act, § 1172-c). And by a ceremonial marriage she receives the right to support — even though the circumstances are such that grounds for annulment exist — for the entire period that the parties live together as husband and wife, unless and until there is an actual judicial declaration of annulment. (See *Sleicher* v. *Sleicher, supra,* 251 N. Y. 366, 370; *Bostick* v. *State,* 1 Ala. App. 255; *State* v. *Loyacano,* 135 La. 945.)

The subsequent fortunes of the remarriage, and whether or no it is later terminated, are in no way material to the agreement; the husband's obligations are by its terms to continue only until she remarries, and there is nothing in the agreement which can serve as a basis for subsequently reviving those obligations. No one contends that they would be revived if the remarriage ended in divorce (see *Nelson* v. *Nelson,* 282 Mo. 412, 418; *Brandt* v. *Brandt,* 40 Ore. 477), and it is difficult to see any reason for a different result when it ends in annulment. It is certainly unlikely that the parties intended the result to turn upon whether an unsuccessful remarriage is deemed in law void

— as is the one in this case (Domestic Relations Law, § 6) — or voidable (Domestic Relations Law, § 7) or valid, until dissolved by a decree of divorce. Rather, the understanding must have been that, upon the wife's remarriage, the husband could regard himself as free of the duty to support her. He could then assume new obligations — he could himself remarry, if he were of a mind to, but his means limited — without remaining forever subject to the possibility that his first wife's remarriage would be annulled and the burden of supporting her shifted back to him. And the wife, too, must have understood that by remarrying she abandoned her rights to support under the agreement, for better or for worse, in favor of whatever support would be furnished her by her second mate.

These arguments were, of course, available to the husband at the time of the *Sleicher* case, but, as already noted, the fact situation was materially altered in the interim. In 1929, when *Sleicher* was decided, there was no section 1140-a, with the consequence that, if the remarriage ended in annulment rather than divorce, no alimony could have been awarded against the second spouse. If the court had determined that the wife had lost her rights under the agreement as well, she would have had no source of support whatsoever. To avoid this harsh result, the court had recourse to the doctrine that annulment relates back to destroy the marriage from the beginning — fully recognizing that it was " ' a fiction of law adopted * * * solely for the purposes of justice ' "— to hold that there was no " remarriage " under the terms of the agreement. At the same time, however, in order to deny recovery for the period that the second marriage continued, the court acknowledged that the doctrine was " not * * * without limits, prescribed by policy and justice " (251 N. Y., at p. 369).

Today, through the operation of section 1140-a, the wife can receive support from the husband of the annulled marriage, where " justice requires," and there is no more reason to revive the obligation of the first husband — a stranger to the annulment — than there would be if the remarriage were terminated by divorce. The " purposes of justice " now dictate that his discharge, effected when the wife goes through a second marriage, be permanent, that he be not required to stand perpetually ready to resume her support should the remarriage

some day be annulled. The interests of justice require, too, that, as between successive husbands, the wife look to the last one for support, and, certainly, that she be given neither two sources of support nor the ability to choose between her first and second husbands for the more profitable. The court put it most aptly in *Sleicher,* when it wrote, "To say that the judgment of annulment has put the defendant in default through the fiction of relation is to say that the plaintiff shall have support or an equivalent from each of two men during the same period of time, and this by force of a fiction subservient to justice" (251 N. Y., at p. 370).

Not only does the practical justification for the *Sleicher* decision fall with the enactment of section 1140-a, but its doctrinal basis becomes extremely questionable as well. The fiction that annulment effaces a marriage "as if it had never been" is sometimes given effect and sometimes ignored, as the "purposes of justice" are deemed to require. The courts and the legislature have, accordingly, attached to annulled marriages, for certain purposes, the same significance that a valid marriage would have, when a more desirable result is thereby achieved. Thus, although a distinction is sometimes made between void and voidable marriages, the annulled marriage has been given sufficient vitality to constitute valid consideration for a gift in contemplation of the marriage (see *American Sur. Co. v. Conner,* 251 N. Y. 1) ; to make a remarriage by one of the parties during its continuance bigamous (see *McCullen* v. *McCullen,* 162 App. Div. 599) ; and, by statute in this state, to legitimatize any children born of the union (Civ. Prac. Act, § 1135).

By writing section 1140-a into the law, the legislature has chosen, without regard to whether the marriage is void or voidable, to attach to annulled marriages sufficient validity and significance to support an award of alimony, in other words, to serve, the same as any valid marriage would, as the foundation of a continuing duty to support the wife after the marriage is terminated. (See *Johnson* v. *Johnson,* 295 N. Y. 477.) It has declared, in effect, that, for the purpose of sustaining a right to support after annulment, the annulled marriage is no longer to be deemed a nullity, "effaced as if it had never been." In so doing, the legislature has destroyed the very foundation of the *Sleicher* decision. To give an annulled marriage this effect,

and yet stamp it a nullity for the purpose of terminating the first husband's duty of support under the agreement, would fly in the face of logic and consistence.

It is true, as plaintiff points out, that an affirmance places her in a less than happy position because Harragan has died; she can no longer ask the court in the annulment action to amend the decree and exercise its discretion, under section 1140-a, to provide for alimony payments from him. Such a consideration cannot, however, affect our decision. In the ordinary case, it is far more likely that justice will be served by not disturbing the first husband's discharge and by leaving the wife to seek support, from her second husband, in the annulment action. That the second husband has died is unfortunate, but plaintiff's plight is no different from that of any woman whose source of support has come to an end through death. Having remarried, she chose to abandon her right to support from defendant in favor of Harragan. Plaintiff could not retain both husbands as sources of support; having made her choice, she is bound by it, although subsequent events prove it to have been an improvident one.

The judgment appealed from should be affirmed.

FROESSEL, J. (dissenting). I dissent and vote to reverse upon the ground that the words " until she shall remarry ", appearing in the separation agreement, contemplate a valid remarriage and do not mean " until she shall remarry " *unlawfully*. This marriage was absolutely void and was so declared in the annulment decree.

LEWIS, Ch. J., CONWAY, DESMOND, DYE and VAN VOORHIS, JJ., concur with FULD, J.; FROESSEL, J., dissents in a memorandum.

Judgment affirmed.