**Dorothy I. MacPHERSON, Plaintiff-Appellee,**

v.

**Charles R. MacPHERSON, Defendant-Appellant.**

**No. 73–1710.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 7, 1974.

Decided April 26, 1974.

Charles F. Clarke, Cleveland, Ohio, for defendant-appellant; Squire, Sanders & Dempsey, Cleveland, Ohio, Vaden M. Lackey, Jr., Denny, Lackey, Chernau & Castleman, Nashville, Tenn., on brief.

Robert I. Auler of Auler Law Offices,. Champaign, Ill., for plaintiff-appellee.

Before PHILLIPS, Chief Judge, PECK, Circuit Judge, and McALLISTER, Senior Circuit Judge.

PHILLIPS, Chief Judge.

In this conflict of laws case, we are called upon to interpret a separation agreement. The agreement provided, *inter alia,* that the husband (Charles

MacPherson) was to pay $600.00 per month to the wife (Mrs. Dorothy Mac-Pherson) until her remarriage. The wife remarried a bigamist and this marriage subsequently was annulled and declared void *ab initio*. Thereupon, the wife sued for payments under the agreement alleging that she had never remarried.

Jurisdiction is based upon diversity of citizenship. The Tennessee rule of conflict of laws controls.

The critical issue is whether the word "remarriage" means a valid marriage, as the District Court in essence held, or whether this word signifies a time at which the wife's support would commence from a different source. We reverse the District Court and hold that the wife's remarriage terminated the husband's obligation under the agreement.

The parties to this suit were married in 1947 in Illinois, their native state. They remained in Illinois until 1950. Between 1950 and 1962, due to Mr. MacPherson's employment, they lived in three other states. Their final move as a family was to Connecticut in 1962 when Mr. MacPherson was promoted to a position in New York. On December 15, 1966, Mr. MacPherson separated from his wife and moved to New York City.

During the next year, the parties negotiated a separation agreement. Mr. MacPherson signed the agreement in New York on October 13, 1967, and it was forwarded to Connecticut where Mrs. MacPherson signed it on October 31, 1967. The agreement provided, *inter alia:*

"FIRST: . . . that each may reside or acquire a domicile from time to time at such place or places as he or she may desire. . . .

"FIFTH: The Husband shall pay to the Wife for the support and maintenance of the Wife the sum of $600.00 per month . . . beginning July 1, 1967.

"All payments to be made to the Wife by the Husband under this Paragraph FIFTH shall cease upon her death or remarriage or upon the death of the Husband.

"SIXTH: . . . Simultaneously with the execution of this Agreement, the Husband agrees to execute and enter into an Insurance Trust, of even date herewith, the principal beneficiaries of which will be the Wife and the children of the parties hereto. . . . [A]ll of the terms and conditions of the Insurance Trust are hereby incorporated herein by reference with the same force and effect as though the same were set forth herein in full.

"TENTH: . . . [I]t is further agreed to execute any and all further assurances, covenants, agreements or other documents necessary or reasonably required hereafter to effectuate or carry out the terms of this agreement.

"TWELFTH: . . . In the event of the entry of a decree or judgment of divorce, this agreement shall survive as an independent document and shall remain in full force and effect . . . Each party agrees to execute such instruments as shall be necessary from time to time to fulfill the terms of this agreement."

On December 15, 1967, Mrs. MacPherson's attorney mailed the agreement to the attorney for Mr. MacPherson in New York, with instructions that:

"These documents are to be held in escrow by you subject to receipt at our office of properly executed trust agreement, check for $75.86 for taxes, check for $75.00 due Dorothy, check for $1000 payable to Wake, See & Dimes, and undertaking by you to get proper endorsements for the life insurance policies for the trust."

Mr. MacPherson obtained a Mexican divorce on December 29, 1967. Mrs. MacPherson entered an appearance, through counsel, in those proceedings, and the validity of the divorce decree has

not been challenged on this appeal. The decree provided that the separation agreement was approved, but not merged with the decree.

On April 3, 1968, at Folkston, Georgia, Mrs. MacPherson entered into a purported marriage with Frank L. Miles, a/k/a Frank L. Mileski. They returned to Connecticut for two months, until June 15, 1968, when they moved to Florida. On October 22, 1968, Mrs. MacPherson discovered that Frank Miles had a wife from a prior marriage that had not been terminated. Mrs. MacPherson immediately moved to Illinois and remains a resident of Champaign County in that State.

Meanwhile, Mr. MacPherson remarried on January 26, 1968, and a son was born to that marriage on September 28, 1970. He ceased making the support payments under the agreement beginning on June 1, 1968. Mrs. MacPherson requested resumption of the support payments on November 12, 1968.

Mrs. MacPherson's purported marriage to Frank Miles was annulled and declared void *ab initio* by the Circuit Court of the Sixth Judicial Circuit, Champaign County, Illinois, on November 2, 1971. Mr. Miles entered an appearance at the annulment proceeding, waiving any and all process, notice and procedural prerequisites to the hearing. He did not file an answer.

Having considered the above stipulated facts, the U. S. District Court for the Middle District of Tennessee concluded that Connecticut law would govern the separation agreement, and, therefore, there was no "remarriage" because the bigamous wedding was void *ab initio*.

■ Under the doctrine of Klaxon Co. v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L. Ed. 1477 (1941), the Tennessee conflict of laws rule applies in determining what law governs the interpretation of the separation agreement. *See also* First American National Bank of Nashville v. Automobile Insurance Co., 252 F.2d 62 (6th Cir. 1958).

■■ Tennessee law considers a separation agreement which is not incorporated into the divorce decree to be a contract. Brown v. Brown, 198 Tenn. 600, 614–615, 281 S.W.2d 492 (1955). The Tennessee conflicts rule is "that a contract is presumed to be made with reference to the law of the place where it was entered into unless it appears that it was entered into in good faith with reference to the law of some other state." Deaton v. Vise, 186 Tenn. 364, 372, 210 S.W.2d 665, 668 (1948). *See also* Ohio Casualty Insurance Co. v. Travelers Indemnity Co., 229 Tenn. ——, 493 S.W.2d 465, 467 (1973). At least with respect to torts, Tennessee has rejected the "center of gravity" or "dominant contacts" rule in favor of the predictable and uniform rule of *lex loci*. Winters v. Maxey, 227 Tenn. ——, 481 S.W.2d 755 (1972).

■ We agree with the District Court's choice of Connecticut as the law governing the agreement. The final signature on the document took place in Connecticut and both parties became bound at that time. Moreover, the facts and circumstances surrounding the parties and the agreement also support the presumption that they intended Connecticut law to govern their rights and obligations. The marital domicile had been in Connecticut, and Mrs. MacPherson and the five children remained there after Mr. MacPherson moved to New York City. Part of the subject matter disposed of pursuant to the agreement was located in Connecticut. Payments were made to Mrs. MacPherson in Connecticut for almost two years. The Insurance Trust which was incorporated by reference into the agreement provided that it would be administered in accordance with Connecticut law. Finally, since the first clause of the agreement specifically recognized that the parties may acquire other domiciles, the presumption is given added weight that the law of the place of making governs.

Mr. MacPherson contends that New York law governs because the escrow

letter made delivery contingent on a number of occurrences, and the delivery was completed in New York. We hold that the escrow letter merely required Mr. MacPherson to do what he already had agreed to in the separation agreement and did not constitute a list of conditions precedent. To the extent that the letter mentions additional obligations, it only gives Mrs. MacPherson's attorneys a cause of action against Mr. MacPherson and does not alter the separation agreement.

■ The parties are in agreement, and our research shows, that Connecticut has never passed on the question of whether a bigamous remarriage is sufficient to terminate support payments under a separation agreement. Under Tennessee conflicts law, there is a presumption that Connecticut law would be the same as Tennessee law. Marsh v. Fowler, 207 Tenn. 377, 381–382, 340 S. W.2d 881 (1960); Shepard & Gluck v. Thomas, 147 Tenn. 338, 347, 246 S.W. 836 (1922). Normally, we would follow that presumption. Float-Away Door Co. v. Continental Casualty Co., 372 F.2d 701, 704 (5th Cir. 1966), cert. denied, 389 U.S. 823, 88 S.Ct. 58, 19 L.Ed.2d 76 (1967); Gediman v. Anheuser Busch, Inc., 299 F.2d 537, 544 n. 6 (2d Cir. 1962). However, Tennessee law both common and statutory, is silent with respect to the issue at bar, and this presumption therefore is of no assistance in the present case. At any rate, the presumption based on the intent of the parties in having Connecticut law govern takes precedence over the presumption espoused in *Marsh* and *Shepard & Gluck, supra.* We note that the presumption based on the place of making is the more specific of the two and that Tennessee courts have placed great emphasis on interpreting contracts in accordance with the presumed intent of the parties. *Ohio Casualty Insurance Co., supra; Deaton, supra.* Therefore, we must exercise our best judgment as to how a Connecticut court would dispose of the issue at bar.

■ The state courts have not been consistent in their treatment of this issue.[1] Many courts have rested their decision on whether the marriage was void or voidable. A voidable marriage differs from a void marriage in that in the case of the former the marriage is treated as valid and binding until its nullity is ascertained and declared by a competent court. Some courts allow recovery to a wife who entered into a bigamous marriage on the theory that a void marriage is ineffective to alter legal rights. Reese v. Reese, 192 So.2d 1 (Fla.1966); DeWall v. Rhoderick, 258 Iowa 433, 138 N.W.2d 124 (1965). Moreover, even when the marriage is voidable, recovery has been allowed by making use of the legal fiction of "relation back." In those cases when the voidable marriage is annulled and declared void *ab initio*, it is given the same effect as a void marriage. However, many courts have rejected this "relation back" doctrine and deny recovery to the wife when her second marriage is merely voidable. *See, e. g.,* Dodd v. Dodd, 210 Kan. 50, 499 P.2d 518 (1973); Flaxman v. Flaxman, 57 N.J. 458, 273 A.2d 567 (1971).

Some courts have abandoned the void-voidable distinction and, hinging their decision at least in part on equitable grounds, refuse the wife recovery. Beebe v. Beebe, 227 Ga. 248, 179 S.E.2d 758 (1971); Torgan v. Torgan, 159 Colo. 93, 410 P.2d 167 (1966); Denberg v. Frischman, 24 A.D.2d 100, 263 N.Y. S.2d 114 (1965), aff'd, 17 N.Y.2d 778, 270 N.Y.S.2d 627, 217 N.E.2d 675, cert. denied, 385 U.S. 884, 87 S.Ct. 176, 17 L. Ed.2d 111 (1966); Gaines v. Jacobsen, 308 N.Y. 218, 124 N.E.2d 290 (1954). In *Beebe*, the Supreme Court of Georgia noted that the distinction between void and voidable marriages was more imaginary than real. 179 S.E.2d at 760. In *Gaines*, the court said that it was unlike-

---

1. *See* Annotation, 45 A.L.R.3d 1033.

ly the parties intended the outcome to turn upon whether the unsuccessful marriage was void or voidable. 124 N. E.2d at 293.

The equitable grounds for refusing the wife recovery were stated succinctly in *Gaines:*

"Rather, the understanding must have been that, upon the wife's remarriage, the husband could regard himself as free of the duty to support her. He could then assume new obligations—he could himself remarry, if he were of a mind to, but his means limited—without remaining forever subject to the possibility that his first wife's remarriage would be annulled and the burden of supporting her shifted back to him. And the wife, too, must have understood that by remarrying she abandoned her rights to support under the agreement, for better or for worse, in favor of whatever support would be furnished her by her second mate." 124 N.E.2d at 293–294.

Equitable grounds favoring the wife's recovery rest on the strong public policy of assuring the wife's support coupled with the fact that her choice to enter into a bigamous marriage and forfeit her rights under the separation agreement was fraudulently procured and, therefore, involuntary. This latter ground squarely rejects the voluntary abandonment theory.

█ An analysis of Connecticut decisions and statutes forces us to conclude that Connecticut specifically has rejected the equitable grounds that would favor the wife's recovery and the void-voidable distinction, and would hold the remarriage of Mrs. MacPherson to have terminated her rights under the separation agreement.

In Cary v. Cary, 112 Conn. 256, 152 A. 302 (1930), addressing itself to the abandonment theory in an alimony case, the Supreme Court of Connecticut stated:

"The better rule which we adopt, save in the most exceptional circumstances, draws from the voluntary ac-

tion of the wife in remarrying the inference that she has elected to obtain her support from her second husband and has thereby abandoned the provision made for her support by the court in its award of alimony. In Stillman v. Stillman, 99 Ill. 196, 39 Am.Rep. 21, the Supreme Court of Illinois holds: 'The divorced wife abandons the provision made for her support out of the estate of her former husband by the decree of the court, for that adequate support which she contracts for by the subsequent marriage. It is a matter that affects her own happiness, and about which she is perfectly free and competent to make a choice. Whether she acts wisely in her election, or whether in every instance she obtains as good or as adequate a support by her marriage as that which she abandoned, are questions about which courts can have no concern. It is a matter of her own voluntary election.' In Emerson v. Emerson, 120 Md. 584, 596, 87 A. 1033, 1038, it is said: 'Although the better reasoning leads to the conclusion that, as a general rule, as the new husband is obliged to give entire support, therefore the former husband is to be thus relieved.' " 152 A. at 304.

*See also* Lasprogato v. Lasprogato, 127 Conn. 510, 18 A.2d 353 (1941).

Subsequently, in Perlstein v. Perlstein, 152 Conn. 152, 204 A.2d 909 (1964), decided on jurisdictional grounds, the Supreme Court of Connecticut rejected the void-voidable distinction and the legal fiction of "relation back" wherein it stated:

"A marriage ceremony, especially if apparently legally performed, gives rise to a presumptively valid status of marriage which persists unless and until it is overthrown by evidence in an appropriate judicial proceeding. No mere claim of bigamy, whether made in a pleading or elsewhere, would establish that a marriage was bigamous. See cases such as Roxbury v. Bridgewater, 85 Conn. 196, 202, 82 A. 193. Seldom, if ever, would a par-

ty to a bigamous marriage, in the face of the presumption of its validity, feel free to treat the marriage as a nullity without a decree of annulment. Nor do we believe any attorney would advise such a course of conduct. The state's concern in the marriage status of its domiciliaries imperatively demands that the invalidity of the purported marriage be judicially determined before that invalidity be accepted. See Williams v. North Carolina, supra, 317 U.S. 298, 63 S.Ct. 207, 87 L.Ed. 279; 4 Am.Jur.2d, Annulment of Marriage, § 2. If judicial action is needed, it must be because, in some degree at least a status of marriage exists.

\* \* \* \* \* \*

" 'Despite the legal fiction that a judgment in [an annulment] case relates back to the inception of the marriage, for some purposes, such a judgment involves and vitally affects the status of the parties from a logical, legal and practical standpoint.' Buzzi v. Buzzi, 91 Cal.App.2d 823, 825, 205 P.2d 1125, 1126, cert. denied, 338 U.S. 894, 70 S.Ct. 244, 94 L.Ed. 549. The legal fiction that an annulment relates back to destroy the marriage ab initio is one applied only as the 'purposes of justice' require. Gaines v. Jacobsen, 308 N.Y. 218, 225, 124 N.E.2d 290, 48 A.L.R.2d 312. Certainly, neither justice nor this state's interest in the marriage status of its domiciliary would be advanced by the application of such a legal fiction here.

"Our annulment statute itself (§ 46–28), although referring to 'void or voidable' marriages, provides that the court may grant alimony, and custody and support orders for any minor child, as in the case of divorce. Public Acts 1963, No. 105, amended the section by adding a sentence declaring that '[t]he issue of any void or voidable marriage shall be deemed legitimate.' These provisions are irreconcilable with the theory that even a marriage claimed to be void is, or upon the rendition of a decree of an-

nulment retroactively becomes, an absolute nullity ab initio so that nothing in the way of a status or res ever flowed from the marriage. See Gaines v. Jacobsen, supra." 204 A.2d at 911–912.

As pointed out by the court in *Perlstein, supra,* the Connecticut annulment statute specifically recognizes the status of a void marriage and its effect on legal rights and obligations. Section 28, Title 46, of the Connecticut Code, which was in effect at the time the separation agreement was made, provides:

"Whenever from any cause any marriage is void or voidable under the laws of this state or of the state in which such marriage was performed, the superior court may, upon complaint, pass a decree declaring such marriage void, and may thereupon make such order in relation to any child of such marriage and concerning alimony as it might make in a proceeding for a divorce between such parties if married. The issue of any void or voidable marriage shall be deemed legitimate."

We agree with the court in *Perlstein* that § 28 is irreconcilable with the theory that a bigamous marriage is an absolute nullity. Additionally, *Perlstein's* explicit reliance on the decision in *Gaines, supra,* forces us to conclude that Connecticut would adopt the holding and rationale of Gaines v. Jacobsen, *supra,* and deny the wife recovery, at least insofar as the "purposes of justice" require. However, as recognized in *Perlstein* and *Cary, supra,* "cases may arise where the court would not hold that the wife by remarriage had abandoned her right to support from her first husband, but cases will be exceptional and rare which will admit of a variance from the ordinary rule. The burden of removing the case from the operation of the ordinary rule will be upon the wife after the proof of the remarriage has been made." *Cary, supra,* 152 A. at 304. *Perlstein* and § 28 make it clear that proof of a bigamous marriage, standing alone, is not sufficient to mandate resumption of

support payments. It is clear that if the second marriage ended in a divorce, Mrs. MacPherson would not have been entitled to support from Mr. Mac-Pherson. We see no reason to distinguish between a divorce and an annulment, since such a distinction is not recognized under Connecticut law as set forth in § 28.

Insofar as the equities of the case are concerned, they weigh heavily against Mrs. MacPherson. There is a strong public policy of providing for adequate support for a divorced wife. However, Mrs. MacPherson voluntarily elected to seek support from her second husband when she entered into the purported marriage. She held herself out as being remarried and abandoned her rights under the separation agreement. Often, as in this case, the first husband has remarried and has additional children. He is entitled to rely on his ex-wife's new marital status, and it would be manifestly unfair to him and his family to allow his ex-wife to return later demanding support. The rights of innocent third parties must be considered in applying the "purposes of justice" test of *Perlstein, supra*. Whether the ex-wife obtains "as good or as adequate a support by her [re]marriage . . . are questions about which [the] courts can have no concern." *Cary, supra*, 152 A. at 304.

Additional factors militating against the wife's recovery are present. When Mrs. MacPherson left her second husband, she could have returned to Connecticut, sought an annulment and been granted alimony from her bigamous husband. Moreover, even in Illinois, where the marriage was annulled, Mrs. Mac-Pherson could have elected to seek a divorce on the grounds of bigamy and received alimony. Section 20 of the Chapter 40 of the Illinois Statutes (Smith-Hurd) provides in part:

"When a divorce is granted to a woman who shall, in good faith, have intermarried with a man having at the time of such marriage another wife or wives living, the court may, neverthe-

less, allow the plaintiff alimony and maintenance the same as in other cases of divorce. . . ."

Instead, Mrs. MacPherson elected to pursue a path that would preclude her from obtaining support from her second husband. We do not think that she should have such control over her source of support. There is nothing in the separation agreement to indicate that the parties intended that she should be able to exert this control to the detriment of her former husband.

■ Finally, we note that Mr. Mac-Pherson was not a party to the Illinois proceeding and should not have his obligations under the separation agreement determined by it. This is especially true where, as here, the second husband waived process and notice and failed to file an answer, and the proceedings essentially were uncontested.

Each party shall bear his own costs on this appeal.

Reversed.