Max Edward GLASS, Plaintiff-Appellant,

v.

Sandra GLASS, Defendant-Respondent.

No. KCD 27855.

Missouri Court of Appeals,
Kansas City District.

Jan. 31, 1977.

Richard E. Watson, Jay W. Jensen, North Kansas City, for plaintiff-appellant.

Don Witt, Witt & Shafer, Platte City, for defendant-respondent.

Before SHANGLER, P. J., and SWOFFORD and SOMERVILLE, JJ.

SHANGLER, Presiding Judge.

The plaintiff Max Glass appeals the trial court denial of his petition to annul and enjoin enforcement of the alimony judgment previously entered as an incident to the decree which dissolved his marriage to Sandra Glass.

The cause was submitted for adjudication to the trial court on these stipulated facts:

Max Glass and Sandra Glass were divorced by the circuit court of Platte County after a long marriage. The decree obligated Max to pay Sandra $183 monthly alimony. One day after the decree became final, Max announced his engagement to marry his present wife, and confirmed that intention on December 10, 1972, by announcement in the Kansas City Star. The marriage took place on April 8, 1973.

Then, on January 19, 1973, [after the Glass divorce but before Max remarried] Sandra married one Wedding, but did not inform Glass of the event but, in fact, continued to accept alimony. Glass learned of her remarriage and discontinued payment of alimony according to the terms of § 452.075, RSMo 1969, and Glass thereafter setoff $183 from child support payments. Sandra then petitioned the circuit court of Clay County to annul her marriage to Wedding on the contention that he had fraudulently concealed his alcoholism from her. Wedding defaulted to the petition and annulment was granted. Thereafter, Sandra made request that Max resume alimony payments. In the absence of compliance, she registered her Platte County divorce and alimony decree in the District Court of Johnson County, Kansas, as a foreign judgment, an action which led to the garnishment of Glass' wages. The Kansas court stayed enforcement of the garnishment, however, and ordered Glass to pay the monthly alimony into its registry pending adjudication of the Platte County action to annul and enjoin enforcement of the alimony portion of the divorce judgment.

Then, on November 9, 1973, Glass brought a separate action in Clay County [No. 44204] to set aside the Wedding annulment decree entered by that court.

In the petition before us on review Glass alleged that by the Wedding remarriage § 452.075 operated to terminate his obligation for alimony to Sandra and renders that portion of the divorce judgment void. The trial court dismissed the petition and denied relief and also dismissed his action pending in Clay County to set aside the annulment decree of that court.

The contentions on appeal reduce to two: (1) that the remarriage of Sandra to Wedding completely terminated the Glass alimony obligation to Sandra by operation of § 452.075 and (2) the trial court of Platte County was without jurisdiction to dismiss the Glass petition to set aside the annulment decree then pending in Clay County.

The determination of the basic issue rests on the meaning of § 452.075:

When a divorce has been granted, and the court has made an order or decree providing for the payment of alimony and maintenance of the wife, *the remarriage of the former wife shall relieve the former husband from further payment of alimony to the former wife from the date of the remarriage, without the necessity of further court action* . . . [Emphasis supplied.]

The appeal must decide: Is the marriage between Sandra and Wedding, subsequently annulled on the ground of fraud, a *remarriage* within the terms of § 452.075 so as to relieve Glass from further payment of alimony under the Platte County divorce decree?

The parties argue the effect of the annulment on the alimony decree in terms of the dichotomy made by ancient equity between a void and voidable marriage. In contemporary terms, a void marriage results from lack of capacity to consent [*Guthery v. Ball,* 206 Mo.App. 570, 228 S.W. 887 (1921)] or because for other reasons the law allows the ceremony no validity [§§ 451.020 and 451.-030]. A voidable marriage, on the other hand, results from fraud, error, duress, or other imperfect consent. *Henderson v. Ressor,* 265 Mo. 718, 178 S.W. 175, 177[2] (banc 1915). The distinction made is that a void marriage is null from inception whereas a voidable marriage is valid until disaffirmed by decree. *Jordan v. Missouri & Kansas Telephone Co.,* 136 Mo.App. 192, 116 S.W. 432, 434 (1909); Nelson on Divorce and Annulment (2d ed. 1945) §§ 31.01 et seq. A voidable marriage set aside by decree constitutes a judicial declaration that no marriage existed and so—by a fiction of equity—also becomes void from the beginning. *Henderson v. Ressor, supra,* l.c. 177[2]. This doctrine of relation back, however, operates

selectively to protect innocent third parties. 4 Am.Jur.2d, Annulment of Marriage, § 93; *Sleicher v. Sleicher,* 251 N.Y. 366, 167 N.E. 501, 502[5] (1929, Cardozo, C. J.).[1] As between the spouses *inter sese,* the effect of the law is the same whether the marriage is void or voidable, the event is treated as though it had never been.[2] *Sleicher v. Sleicher, supra,* l.c. 502[1–3]; *Flaxman v. Flaxman,* 57 N.J. 458, 273 A.2d 567, 569 (1971); Nelson on Marriage and Annulment (2d ed. 1945) § 31.66; 4 Am.Jur.2d, Annulment of Marriage, § 93.

We are led to conclude that the traditional distinctions between a void and voidable marriage are largely irrelevant to the issue here: whether a subsequent marriage of a spouse later annulled revives the obligation of the other spouse to pay alimony under the divorce decree, or, on the other hand, constitutes a *remarriage* within the meaning of § 452.075 so as to relieve further obligation. The question must be determined from the terms of the enactment itself and the reasons of the lawmaker.

Although the issue comes for decision to a Missouri court for the first time, other courts have confronted the essential question. The issue has arisen in a congeries of forms, but typically under the provisions of separation agreements and statutes which have relieved—in one manner or another— the obligation of one spouse upon the *remarriage* of the other. The cases are collected at 45 A.L.R.3d 1033, Annotation: Alimony—Annulment of Later Marriage. Those of them which rest upon provisions of contract bear only by analogy; those which construe statutes are more nearly relevant. The two enactments which are most nearly equivalent to our own § 452.075 in terms and apparent purpose are § 139 of the California Civil Code and the New Jersey Stat-

1. Thus, the children of a bigamous marriage are treated as legitimate offspring, *Phillips v. Wilson,* 298 Mo. 186, 250 S.W. 408, 412[4] and may inherit as legal heirs [§ 474.080, RSMo 1969; *Nelson v. Jones,* 245 Mo. 579, 151 S.W. 80, 84[12] (banc 1912)]; *Bernheimer v. First Nat. Bank of Kansas City,* 359 Mo. 1119, 225 S.W.2d 745, 751[6–8] (banc 1949).

2. The fundamental distinction between a void and voidable marriage in our decisions is that a void marriage may be collaterally attacked after death to defeat the rights of the pseudo-spouse whereas a voidable marriage is open to attack only in the lifetime of both spouses. *Henderson v. Ressor,* 265 Mo. 718, 178 S.W. 175, 177[2] (banc 1915); Nelson on Divorce and Annulment (2d ed. 1945) § 31.21.

utes § 2A:34–25. Each statute provides that the alimony obligation of the former husband shall terminate on the *remarriage* of the divorced wife. In terms, the California law provides:

> Except as otherwise agreed by the parties in writing, the obligation of any party in any decree, judgment or order for the support and maintenance of the other party shall terminate upon the death of the obligor or upon the remarriage of the other party.

It was contended in *Sefton v. Sefton,* 45 Cal.2d 872, 291 P.2d 439 (In bank 1955) that the annulment of her *remarriage* revived the obligation of her former husband for payment of alimony under the divorce decree. At issue was the meaning to be accorded *remarriage* adopted into the property settlement agreement from § 139 of the California Civil Code. The second marriage had been induced by fraud and thus, by traditional concepts, was voidable. She contended—as does Sandra Glass Wedding here—that by the doctrine of relation back the annulment effaced the second marriage altogether so that in the mind of the law she was not married and so was entitled to the benefits of alimony. *Sefton* responded that the courts use the relation back fiction to do justice, and not to injure innocent persons—such as the first husband who was not an actor in the second ceremony. The court held that the ceremony of *remarriage* terminated the alimony obligation under the property settlement agreement and the statute and rested this conclusion on three reasons of policy [l.c. 441]:

1. A former husband is entitled to rely on the remarriage ceremony of the former wife to recommit assets previously used for alimony obligations to her.

2. Unless the remarriage ceremony is taken as conclusive, any latent grounds for annulment between the remarried spouse and her new husband may remain suspended until the offended spouse seeks annulment, so that the former husband's alimony obligations may never be certainly determined.

3. Even though both former spouses may be innocent, the more active of the two [the one whose remarriage is later annulled] should bear the loss from the misconduct of a stranger.

*Berkely v. Berkely,* 269 Cal.App.2d 872, 75 Cal.Rptr. 294 (1969) applied the *Sefton* rationale to a void remarriage to terminate the alimony right of the remarried spouse. The court expressly found void-voidable marriage distinction irrelevant to the purposes of the statute and held that the remarriage ceremony itself terminated the obligation for alimony.

New Jersey has given § 2A:34–25 the same effect as the California counterpart except that those provisions become operative only upon proof that the former wife has remarried:

> If after the judgment of divorce the wife shall remarry, the court shall not make any order as to the alimony of such wife except that upon application of the former husband, on notice and on proof of the marriage of the former wife after the judgment of divorce, the court shall modify any order or judgment as to the alimony of the former wife by vacating and annulling any and all provisions in any such order or judgment, or both, directing the payment of money for the support of the former wife.

At first, the New Jersey court construed this statute in terms of the void-voidable distinction [*Minder v. Minder,* 83 N.J.Super. 159, 199 A.2d 69 (1964)—void remarriage of former wife does not terminate alimony from former husband—*Sharpe v. Sharpe,* 109 N.J.Super. 410, 263 A.2d 490 (1970)—voidable remarriage sufficient to terminate alimony] but then rejected the dichotomy altogether in *Richards v. Richards,* 139 N.J. Super. 207, 353 A.2d 141 (1976). *Richards* stated this rationale [l.c. 144]:

> This court cannot see any reason to continue the disparate treatment of void and voidable marriages. In either case, the reasonable expectations of both the wife and the first husband are that the wife's

remarriage will be valid. The first husband should have a right to rely on that expectation. He should not be required to be forever "waiting in the wings" for a possible dissolution of the remarriage of his former wife. Certainly, when a former wife remarries, the divorced husband does not concern himself with any legal distinctions between void and voidable. She has married. He is free. In the interests of fairness, the last previous husband must be the source of the wife's future financial security.

Other courts, on a parity of policy reasons, have concluded—even in the absence of statutory provision—that the annulment of the remarriage of the former wife does not revive the alimony obligation of the former husband. *Keeney v. Keeney,* 211 La. 585, 30 So.2d 549 (1947); *Torgan v. Torgan,* 159 Colo. 93, 410 P.2d 167 (1966); *Beebe v. Beebe,* 227 Ga. 248, 179 S.E.2d 758 (1971); *Gaines v. Jacobsen,* 308 N.Y. 218, 124 N.E.2d 290 (1954); *Surabian v. Surabian,* 362 Mass. 342, 285 N.E.2d 909 (1972); *Chavez v. Chavez,* 82 N.M. 624, 485 P.2d 735 (1971).

We conclude, therefore, that *remarriage* within § 452.075 refers to the ceremony of marriage and not to the status or relationship—valid, voidable or void—which actually results. The public policy which our enactment establishes rests on the same considerations of fairness which the California and New Jersey courts discern for their statutory counterparts: the right of the husband to rely on the apparent remarital status of the former wife, the lack of standing of the husband to challenge the validity of the *remarriage,* and the justness that— as between them—the former wife should bear the consequences of events she brought on. That the *ceremony of remarriage* operates absolutely to terminate the alimony obligation of the former husband appears conclusively from the terms of § 452.075 which gives effect to that law "without the necessity of further court action".

The plaintiff, Sandra Glass Wedding, argues that these considerations do not apply to her because Max Glass announced and confirmed his plans to remarry long before her *remarriage*: Thus, she contends, Max could not have relied on her *remarriage* to his detriment nor did he recommit assets nor was otherwise harmed in any way by that event. She relies on *Peters v. Peters,* 214 N.W.2d 151 (Iowa 1974).

*Peters* held that the obligation of the former husband for alimony continued under a divorce decree where: he did not know of the remarriage of the former wife until four days before it was annulled, his personal financial affairs were unaffected, the remarriage of the former wife could not be annulled after cohabitation, and she had no right of support [under Texas law] from the second husband even upon divorce. The former wife had gone through the ceremony of marriage in Texas while intoxicated, the nuptial was not consummated, and she and her putative husband agreed the next day that the marriage should be annulled. These peculiar circumstances led to the decision that the obligation for alimony had been revived by the annulment of the *remarriage* status.

Neither the facts nor the theory of *Peters* aids Sandra as a precedent. Sandra remarried voluntarily, but Peters was so drunk she was incapable of consent. Even that consideration did not bear on the decision, for *Peters* gave no account to whether the remarriage was void or voidable on the premise that [l.c. 156] "[i]t is unlikely the parties and court consider that distinction . . . at the time a divorce decree is entered". The decision rested, finally, on the effect to be given a divorce decree which provided that the husband pay to the wife alimony in gross over seventeen years. The court concluded that these amounts, although characterized as alimony for tax purposes, were intended to assure adequate support for the children. It was unlikely, therefore, that the divorce decree contemplated this support should be lost by the kind of *remarriage* shown by the evidence.

The contention of Sandra Glass for the revival of alimony does not rest [as in *Peters*] on the construction of an order for

child support guised as an order for wife support, but on a statutory enactment which, in absolute terms and without need of judicial intervention, terminated that obligation upon her *remarriage* ceremony. We are not persuaded that the policy considerations the statute conveys do not apply to Glass merely because his intention to remarry was confirmed before the Wedding ceremony. A man under judgment to pay alimony to a former spouse is equally burdened by that obligation, whether sole or remarried, and cannot commit that sum to other needs and purposes. If sole, the release from that obligation could allow remarriage; if remarried, the start of a new family. In either event, the normal need to plan for security and well-being of person and family is sufficient reason to allow the former husband to rely and act on the apparent marital status of the former wife without requirement that he evaluate the legality of that status.

The plaintiff finally contends that legislative concern for the support of a divorced wife is a policy of such long history in this state that § 452.075 cannot reasonably contemplate that such a marriage as hers to Wedding should terminate the right of support from Glass. She sustains this position with the assumption that since Missouri has no provision to allow the former wife support from the second or annulled husband, § 452.075 intends that she receive her support from the first husband.

The law has concern for the support of a divorced wife and makes provision for it, formerly as alimony [§ 452.070 repealed by Laws 1973], and now as maintenance [§ 452.335, Laws 1973, p. 470]. Alimony is treated as the equivalent of the obligation for support which arises to the wife out of the marriage contract and, on principle, is abandoned when she obtains the same obligation for support by a second marriage contract. *Nelson v. Nelson,* 282 Mo. 412, 221 S.W. 1066, 1067[3] (banc 1920). This policy of concern for the support of the divorced wife is not diminished by § 452.-075. Rather the imperative of that statute that alimony shall terminate upon remarriage of the wife treats her subsequent marriage as her election to look to that source exclusively for her future support. See, *Gaines v. Jacobsen,* 308 N.Y. 218, 124 N.E.2d 290, 294 (1954); *Keeney v. Keeney,* 211 La. 585, 30 So.2d 549, 551[2] (1947). The plaintiff contends, however, that § 452.075 must be construed to ensure her the additional solicitude of the support from the first husband in the event the second marriage proves unavailing for that purpose. That insistence sounds an alien note. Woman has long since overcome the mythos of a gender born weak and in need of the special protection.

Although the law continues to impose upon the father primary responsibility for the support of the children of the marriage [§ 452.340], in all other respects the Dissolution of Marriage Act treats the spouses as equally responsible in their domestic relations. See, e. g., *Corder v. Corder,* 546 S.W. 2d 798 (Mo.App.1977), adopted concurrently. Thus, § 452.075 views the *remarriage* as the act of a responsible agent, not subject to recall because it proves to be mistaken. See, *Herscher v. Herscher,* 51 Misc.2d 921, 274 N.Y.S.2d 295, 298 (1966). It also recognizes that a man owes no duty to a woman who is the wife of another. To rest the effect of § 452.340 on the validity of the remarriage status would introduce another uncertainty into an already troubled area of domestic relations.

The failure of our legislature to provide the right of support from the annulled marriage to the former wife is consistent with the premise of the Dissolution of Marriage Act—and § 452.075—that both spouses are of equal responsibility. We recognize that two jurisdictions—New York and New Jersey—which follow the rule we adopt also have enacted statutes which allow the court on annulment discretion to grant alimony to the wife as an incident of that procedure. The right to alimony in such circumstances, however, is not a concomitant of a rule which refuses to revive the alimony obligation of the first husband on the annulment of the *remarriage* of the former wife, but is a separate expression of domestic policy.

Thus, the New Jersey courts [*Flaxman v. Flaxman,* 57 N.J. 458, 273 A.2d 567 (1971) and *Sharpe v. Sharpe,* 109 N.J.Super. 410, 263 A.2d 490 (1970)] announced the rule that the annulment of a voidable marriage does not revive alimony from the first husband under an agreement and decree which terminated the obligation on the *remarriage* of the wife several years before the enactment of the annulment—alimony statute. And the New York court in *Gaines v. Jacobsen,* 308 N.Y. 218, 124 N.E.2d 290, 292[1–2] (1954) adopted the same rule to the same question which arose in Connecticut and thus decided on the common law of New York as it stood before the enactment of the annulment—alimony statute.

We conclude that the *remarriage* of Sandra Glass to Wedding terminated her right to support from Max Glass.

The cause is reversed and remanded for proceedings consistent with this opinion.

All concur.