## THOMAS FREDO *v.* KRISTIN FREDO

Superior Court, Judicial District of Hartford
File No. FA-04-4000885S

Memorandum filed December 12, 2005

*Budlong & Barrett, LLC,* for the plaintiff.

*Kristin Fredo,* pro se, with whom was *Hersh & Crockett,* for the defendant.

*Berger, Santy & Barbieri,* guardian ad litem, for the minor children.

SOLOMON, J. The issue set forth in the present case is whether an order for the payment of periodic alimony contained in a decree of dissolution of marriage (entered pursuant to an agreement of the parties), which is expressly terminable upon, inter alia, the remarriage of the alimony recipient, is revivable in the event of an annulment of the recipient's subsequent marriage. It appears that this issue has not been previously addressed by the courts of this state.

The following facts are undisputed. The parties were married in 1993. The marriage was dissolved pursuant to a decree of dissolution dated November 24, 2004

(decree). That decree incorporated the parties' agreement and stipulation (agreement) bearing the same date. Both parties were represented by counsel. The agreement provided that Thomas Fredo, the plaintiff husband, would pay alimony to Kristin Fredo, the defendant wife, in the amount of $250 per week. Those payments were to terminate upon the earliest occurrence of three specific contingencies: first, the death of either party; second, the remarriage of the defendant; and, third, December 31, 2009. The order was nonmodifiable as to its duration. On June 8, 2005, the defendant was married in Las Vegas, Nevada, to Timothy Doyle, a man who, by her own acknowledgment, she had been seeing on and off for some time.

By motion dated June 21, 2005, the plaintiff, unaware that the defendant had remarried, sought to terminate the alimony on the basis of her cohabitation with Doyle. By the time the aforementioned motion was argued before this court, the plaintiff had learned of the defendant's remarriage and sought a declaration that the alimony had terminated by reason thereof as provided in the agreement and the decree. The defendant, through counsel, represented that she and her new husband had not discussed a number of issues, that the marriage was a mistake and that she was seeking to have it annulled in the Nevada courts. In contemplation and by reason of the alleged pending annulment, she claims that her remarriage should not result in the termination of alimony payments. It is the opinion of this court that alimony terminates upon remarriage and is not resurrected by subsequent events.

In the first instance, the court notes that the exercise of judicial power in the present matter is, in all likelihood, unnecessary. The provision in the agreement regarding the termination of the alimony obligation is self-executing. Certainly, no further judicial action would have been necessary to terminate the alimony

in the event that any of the other specified termination contingencies had occurred. Clearly, one would not have expected either party to seek a court-ordered termination of the alimony if either party had died or December 31, 2009, had passed. Either event would have resulted in an automatic termination of the alimony payments pursuant to the terms of the agreement and decree. The defendant's remarriage is no less definitive—the ceremonial marriage constituted a remarriage within the meaning of the agreement and decree. Indeed, our appellate courts, in dicta, have recognized that a provision calling for termination of alimony upon remarriage is self-executing. In *Stein* v. *Stein*, 49 Conn. App. 536, 714 A.2d 1272 (1998), our Appellate Court dealt with an alimony recipient who had obtained full-time employment. The parties' decree provided for the termination of alimony upon the earliest occurrence of the death of either party, the remarriage of the recipient or her full-time employment. The court found the provision in question to be self-executing and that the alimony terminated when she found full-time employment, "just as it would upon [her remarriage]." Id., 540. Similarly, in *DeMaria* v. *DeMaria*, 47 Conn. App. 729, 707 A.2d 741 (1998), rev'd on other grounds, 247 Conn. 715, 724 A.2d 1088 (1999), the court found a provision in the dissolution decree calling for the termination of alimony upon remarriage to be self-executing. Id., 731–32 n.5.

Even if the termination provision were not self-executing, it is this court's opinion that, when the agreement provides that the payor's obligation to pay alimony shall terminate upon remarriage, a later annulment of that marriage does not revive the payor's obligation to pay. Although this issue apparently has not been addressed by the courts of this state, it has been addressed, with some degree of frequency, in other jurisdictions. Those jurisdictions that have addressed the issue follow one of three approaches.

One approach is the void-voidable approach, pursuant to which an existing alimony obligation is revived following the annulment of a void marriage and, generally, extinguished following the annulment of a voidable marriage. *Broadus* v. *Broadus*, 361 So. 2d 582 (Ala. Civ. App. 1978); *Evans* v. *Evans*, 212 So. 2d 107 (Fla. App. 1968); *Watts* v. *Watts*, 250 Neb. 38, 547 N.W.2d 466 (1996); *Darling* v. *Darling*, 44 Ohio App. 2d 5, 335 N.E.2d 708 (1975); *Brown* v. *Brown*, 29 S.W.3d 491 (Tenn. App. 2000). The courts distinguish between void and voidable marriages on the ground that voidable marriages are valid until the annulment is granted (and then deemed void as of the date of the marriage through a legal fiction known as the relation back doctrine), whereas void marriages are void ab initio.

On the other hand, a significant number of courts eschew the void-voidable distinction and conclude that the remarriage of the alimony recipient automatically terminates the alimony obligation irrespective of subsequent events. *Hodges* v. *Hodges*, 118 Ariz. 572, 578 P.2d 1001 (Ariz. App. 1978); *Berkely* v. *Berkely*, 269 Cal. App. 2d 872, 75 Cal. Rptr. 294 (1969); *R.L.G.* v. *J.G.*, 387 A.2d 200 (Del. Fam. Ct. 1977); *Hutton* v. *Hutton*, 118 S.W.3d 176 (Ky. 2003); *Surabian* v. *Surabian*, 362 Mass. 342, 285 N.E.2d 909 (1972); *Glass* v. *Glass*, 546 S.W.2d 738 (Mo. App. 1977); *Shank* v. *Shank*, 100 Nev. 695, 691 P.2d 872 (1984); *Flaxman* v. *Flaxman*, 57 N.J. 458, 273 A.2d 567 (1971); *Chavez* v. *Chavez*, 82 N.M. 624, 485 P.2d 735 (1971); *Denberg* v. *Frischman*, 24 App. Div. 2d 100, 264 N.Y.S.2d 114 (1965), aff'd, 17 N.Y.2d 778, 217 N.E. 2d 675, 270 N.Y.S.2d 627, cert. denied, 385 U.S. 884, 87 S. Ct. 176, 17 L. Ed. 2d 111 (1966).

Yet a third approach disregards either of the foregoing and would have the court decide the issue on a case-by-case basis. This least followed approach is utilized by a distinct minority of jurisdictions and, in at least three cases, has been adopted by divided courts. *In re Marriage of Cargill*, 843 P.2d 1335 (Colo. 1993) (over three

dissenters); *Peters* v. *Peters*, 214 N.W.2d 151 (Iowa 1974) (four to three majority); *In re Marriage of Williams*, 208 Mont. 252, 677 P.2d 585 (1984); *Joye* v. *Yon*, 355 S.C. 452, 586 S.E.2d 131 (2003) (three to two majority); *Ferguson* v. *Ferguson*, 564 P.2d 1380 (Utah 1977).

This court believes that the case-by-case approach is the least desirable option. By its very nature, it provides the least certainty and guidance to litigants in family cases (which may explain, at least in part, why so few jurisdictions employ this approach). One can scarcely doubt that parties to a decree of dissolution of marriage, to the extent possible, look for finality in concluding their relationship and certainty regarding the rights and obligations arising therefrom. That is particularly apparent from the agreement in the present case, which provides that the alimony obligation created therein would terminate nonmodifiably upon the first occurrence of one of three specific events: (1) the death of either party; (2) the defendant's remarriage; or (3) December 31, 2009.

Adoption of the case-by-case approach would eviscerate the clear intent of the agreement and deprive the parties of the finality and certainty for which they bargained. A review of the cases that have adopted this approach demonstrates the breadth of the considerations that a court might consider in making its determination: length of the subsequent marriage; whether the alimony recipient receives support as a result of the annulled marriage; the degree to which the payor spouse is prejudiced by the revival of the alimony obligation; the circumstances surrounding the annulment; any changes in the parties' respective financial circumstances, and the like. Query whether the scope of this analysis is an all or nothing assessment of the revivability of the alimony obligation or, alternatively, does it allow a measured response from the trial court in the form of a modification of the original order? Far from creating a bright line, this approach establishes no line.

It vests far too much discretion in a court on an issue that the parties, by the terms of their agreement, decided for themselves. Although this approach may appeal to those interested in intellectual analysis, it does little to assist family law litigants in their efforts to plan and move on with the very real lives that they lead. Accordingly, for all the foregoing reasons as well as those further considerations hereinafter set forth, the court rejects the case-by-case approach as a means of resolving this issue.

This leaves the court with one of the two remaining alternative approaches: the automatic termination approach or the void-voidable approach. Under the automatic termination approach, the recipient's right to alimony under the decree would be extinguished, in any and all events, upon the occurrence of the ceremonial marriage with her subsequent husband. Under the void-voidable approach, the recipient's right to alimony under the decree is revivable only if the annulled subsequent marriage is determined to be void (as opposed to voidable). Because the defendant, at best, posits a claim that her subsequent marriage is voidable (rather than void), it matters little for purposes of the present case whether this court adopts the automatic termination approach or the void-voidable approach. Either way, the alimony obligation is not revivable.

This court joins those courts that have adopted the automatic termination approach; to wit: that alimony automatically terminates upon the recipient's remarriage. This approach accords with the clear and unambiguous language used by the parties. "The agreement says nothing about the status of the remarriage and termination of the alimony is not made to turn on its validity. . . . The agreement simply provided that alimony was payable until appellee remarried. *The word 'Remarriage' is an ordinary one in common usage* and the agreement contains nothing to indicate anything

other than its use in its popular or conventional sense was intended." *Dodd* v. *Dodd*, 210 Kan. 50, 55, 499 P.2d 518 (1972); see also *In re Marriage of Kolb*, 99 Ill. App. 3d 895, 425 N.E.2d 1301 (1981); *Hutton* v. *Hutton*, supra, 118 S.W.3d 176. The approach also accords with the intent of the parties. By entering into another marriage, the alimony recipient has made an election to look to another for support. That election in no way hinged on how the later marriage worked out. That the subsequent marriage may later be determined not to be valid does not detract from such a result any more than would the untimely death of the recipient's new spouse or a sudden breakdown in their relationship soon after the marriage has taken place.

"The subsequent fortunes of the remarriage, and whether or [not] it is later terminated, are in no way material to the agreement; the husband's obligations are by its terms to continue only until she remarries, and there is nothing in the agreement which can serve as a basis for subsequently reviving those obligations. No one contends that they would be revived if the remarriage ended in divorce . . . and it is difficult to see any reason for a different result when it ends in annulment. *It is certainly unlikely that the parties intended the result to turn upon whether an unsuccessful remarriage is deemed in law void—as is the one in this case . . . or voidable . . . or valid, until dissolved by a decree of divorce. Rather, the understanding must have been that, upon the wife's remarriage, the husband could regard himself as free of the duty to support her. . . . And the wife, too, must have understood that by remarrying she abandoned her rights to support under the agreement, for better or for worse, in favor of whatever support would be furnished her by her second mate."* (Citations omitted; emphasis added.) *Gaines* v. *Jacobsen*, 308 N.Y. 218, 223–24, 124 N.E.2d 290 (1954).

Interests of finality and certainty are furthered only by the automatic termination approach. Upon the recipient's remarriage, the obligor has every right to reorder his or her life and commit to things which theretofore might not have been practical or possible. See *Hodges* v. *Hodges,* supra, 118 Ariz. 572; *Berkely* v. *Berkely,* supra, 269 Cal. App. 2d 872; *Denberg* v. *Frischman,* supra, 24 App. Div. 2d 100. Indeed, any latency in the grounds for an annulment would effectively suspend, rather than terminate, the obligation to pay until the offended spouse (1) discovered the basis for any annulment, and (2) elected to take action, so that the extent of the obligation is never finally determined. If "remarriage" referred only to a valid second marriage, the alimony obligor would be placed in the untenable position of never being certain that the financial responsibility for his former wife would not shift back to him. *Flaxman* v. *Flaxman,* supra, 57 N.J. 463.

Other practical considerations warrant adoption of the automatic termination approach. The obligor may not, indeed likely would not, have access to the facts that form the basis for the claimed annulment and, moreover, would certainly lack standing in an annulment proceeding to be heard on the issue of the validity of the subsequent marriage. This is particularly problematic when, as has been the case in this court's experience, the issue of the propriety of an annulment is seldom vigorously contested if, in fact, it is contested at all. Is the obligor, a nonparty to the annulment proceedings, collaterally bound thereby? And if not, how does the obligor, a stranger to the facts underlying the annulment, go about uncovering them in his effort to attack the annulment decree collaterally? Moreover, any approach other than the automatic termination approach would allow for the unseemly possibility that the alimony recipient may have rights of support from two spouses (resurrecting the alimony obligation under

the existing decree and creating new obligations from the subsequent spouse in the annulment-dissolution proceeding.) Even if a court were not inclined to allow the existence of dual support orders, the recipient would be in the enviable position of choosing the source of support she prefers. These issues were recognized in *Flaxman* in the court's observation that only the recipient "and [the] second 'husband' ordinarily would know whether there was cause for an annulment, and the option would be hers either to annul or ratify the marriage." Id.

Furthermore, if the subsequent marriage is determined to be void and, therefore, a nullity ab initio, the terminating event (remarriage) would be deemed not to have occurred. Under these facts, absent application of the automatic termination approach, the obligor not only remains obligated to continue paying in the future—he arguably remains obligated to pay an arrearage that accrued back to the date of the remarriage, which "never took place." Finally, resurrection of an extinguished alimony obligation in the context of a self-executing termination provision would contravene the well established rule in this state that a party who relinquishes their claim to alimony is forever barred from obtaining such relief in the future. If a spouse waives alimony at the time the decree enters, not knowing what the future may hold, and is bound by that election, how much more compelling is the relinquishment of their right to alimony when it occurs as a result of their election to remarry.

All of these issues arise because the recipient, as here, made an election to look elsewhere for her support. The obligor "has a right to assume the validity of the second marriage and to arrange his affairs accordingly. When his former wife voluntarily accepts the risk of a subsequent marriage, he should not be held accountable for her gullibility, mistake or misfortune." *McConkey* v. *McConkey*, 216 Va. 106, 108, 215 S.E.2d 640 (1975). To

the extent that the plaintiff and the defendant may be viewed as innocent of any wrongdoing, "it accords with the policy of the law to look less favorably upon the more active of two innocent parties when by reason of such activity a loss is sustained as the result of the misconduct of a stranger." *Sefton* v. *Sefton*, 45 Cal. 2d 872, 877, 291 P.2d 439 (1955).

For all of the reasons previously indicated, this court finds that the occurrence of the defendant's ceremonial marriage to her new spouse constituted a remarriage within the meaning of the agreement and decree. By virtue of her election to proceed with that marriage, the plaintiff's alimony obligation to the defendant terminated at that time.